_____

No. 95-2857
_____

Shrink Missouri Government PAC,   *
a political action committee;   *
W. Bevis Schock; Frederick T.   *
Dyer,   *
   *
      Appellees,   *
   * Appeal from the United States
   v.   * District Court for the
   * Eastern District of Missouri.
John Maupin, in his official   *
capacity as Chair of the   *
Missouri Ethics Commission;   *
Jeremiah W. Nixon, is his   *
official capacity as Missouri   *
Attorney General,   *
   *
      Appellants.   *

_____

Submitted:  September 13, 1995

Filed:  December 19, 1995
_____

Before BOWMAN, ROSS, and JOHN R. GIBSON, Circuit Judges.

_____

BOWMAN, Circuit Judge.


     Missouri's Campaign Finance Disclosure Law, Mo. Rev. Stat. Ch. 130 (1994), was amended twice in 1994. In July the state legislature adopted a measure commonly known as Senate Bill 650, and in November the citizens of Missouri adopted a ballot initiative commonly known as Proposition A. Both of these measures limit election campaign contributions and expenditures and thus tend to limit the free exercise of political speech that the First Amendment guarantees. W. Bevis Shock and Frederick T. Dyer,

prospective candidates for public office, and Shrink Missouri Government PAC, a political action committee (PAC) planning to make campaign contributions in future elections, sought a permanent injunction against the implementation and enforcement of the following provisions of the amended Campaign Finance Disclosure Law: (1) the Proposition A limits on campaign contributions, Mo. Ann. Stat. § 130.100 (Vernon Supp. 1995), as applied to contributions by candidates to their own campaigns; (2) the limits on total expenditures by candidates, id. §§ 130.052, 130.053; (3) the restrictions on carrying over campaign funds from one election to another, id. § 130.130; and (4) the requirement that negative campaign advertisements state that they were approved and authorized by the candidate on whose behalf they were disseminated, id. § 130.031. On cross-motions for summary judgment, the District Court[1] held that each of these provisions violated the First Amendment rights of candidates and their contributors. The court enjoined the Attorney General of Missouri and the Chair of the Missouri Ethics Commission (referred to herein jointly as "the state") from implementing, enforcing, or acting in reliance on the challenged provisions. Shrink Missouri Government PAC v. Maupin, 892 F. Supp. 1246 (E.D. Mo. 1995). The state now timely appeals.[2] After a de novo review of the District Court's judgment, see Maitland v. University of Minnesota, 43 F.3d 357, 360 (8th Cir. 1994), we conclude that the challenged provisions violate the First Amendment. We therefore affirm the well-reasoned decision of the District Court.

---

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

[2]The state does not appeal the District Court's decision that the "approved and authorized" requirement of Mo. Ann. Stat. § 130.031 is unconstitutional, so that issue is not before us.

-2-

I.

As a preliminary matter, we must address the state's contention that summary judgment should not have been granted because genuine issues of material fact remain in dispute. See Fed. R. Civ. P. 56(c). The state did not make this contention in the District Court. Moreover, as the state notes, both sides agreed that the case could be decided on the cross motions for summary judgment. The state thus has waived the issue. See Empire State Bank v. Citizens State Bank, 932 F.2d 1250, 1253 (8th Cir. 1991). In any event, we are satisfied that no genuine issues of material fact remain in dispute.

II.

The State argues that the District Court erred when it (1) addressed the constitutionality of applying the Proposition A contribution limits to the candidates themselves because no Article III case or controversy existed between the parties with respect to that issue; (2) held that the state's "voluntary" expenditure limits scheme is unconstitutional; and (3) held that the restrictions on carrying over campaign funds from one election to another is unconstitutional. We will address each of these arguments in turn.

A.

The District Court held that the Proposition A campaign contribution limits are unconstitutional to the extent that they limit a candidates's ability to use his or her personal funds or property in support of the candidate's own campaign for public office. See Mo. Ann. Stat. § 130.100 (Vernon Supp. 1995) (limiting "contributions"); Mo. Rev. Stat. § 130.011(12)(a) (1994) (defining "contributions" to include a "candidate's own money"). The state argues that the District Court was without jurisdiction to consider

this question, there being no Article III case or controversy because state officials have not threatened to prosecute candidates for making over-the-limit contributions to their own campaigns. We need not consider the jurisdictional point, however, because in a companion case this Court has held that the Proposition A contribution limits are unconstitutional on their face. Carver v. Nixon, No. 95-2608, slip op. at 25 (8th Cir. Dec. 19, 1995). Thus those limits necessarily are unconstitutional as applied to candidates as well as to other contributors.

B.


The District Court held that Senate Bill 650's "program of voluntary expenditure ceilings," State's Brief at 13, is coercive, restricts protected speech, and fails to pass constitutional muster under the strict scrutiny test. Shrink Missouri Gov't PAC, 892 F. Supp. at 1252. The state argues that these voluntary spending limits are constitutional under Buckley v. Valeo, 424 U.S. 1 (1976) (per curiam), in which, inter alia, the Supreme Court struck down spending limits imposed by the Federal Election Campaign Act of 1971 as amended in 1974, 2 U.S.C. § 441a (1976).


The statute at issue in this case requires candidates for elected public office in Missouri to file an affidavit stating whether they will comply with spending limits that vary depending on the office sought. Mo. Ann. Stat. § 130.052.1 (Vernon Supp. 1995). The affidavit must be filed with the candidate's declaration of candidacy. Candidates who choose not to comply with the spending limits may accept contributions from individuals only and must refuse contributions from PACs, political parties, labor unions, corporations, etc. Id. § 130.052.3. Non-complying candidates also must submit daily disclosure reports once they exceed the spending limits. See id. § 130.052.3. No such restrictions or requirements are placed on candidates who swear to

-4-

abide by the limits, though they are penalized if they spend more than the applicable limit, see id. § 130.053.1.

When considering whether a campaign finance law unconstitutionally infringes freedom of speech, this Court's task is to decide whether the provision in question actually "burdens the exercise of political speech and, if it does, whether it is narrowly tailored to serve a compelling state interest." Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 657 (1990) (citing Buckley, 424 U.S. 1); see also Day v. Holahan, 34 F.3d 1356, 1361 (8th Cir. 1994), cert. denied, 115 S. Ct. 936 (1995).

Relying on a footnote in Buckley, the state argues that the expenditure limits are clearly constitutional regardless of the level of scrutiny applied because they are voluntary and merely provide an incentive for compliance. In Buckley, the Supreme Court held that limitations on the total expenditures by a candidate for federal office violated the First Amendment. 424 U.S. at 54-58. The Court nonetheless noted that

> Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations. Just as a candidate may voluntarily limit the size of the contributions he chooses to accept, he may decide to forgo private fundraising and accept public funding.

Id. at 57 n.65. The spending limits adopted by the Missouri legislature differ substantially from the scenario described in footnote 65 of Buckley and are thus distinguishable.[3] The Senate

---

[3]Because the Missouri expenditure limits are distinguishable from the scenario described in the Buckley footnote, we need not and do not address the difficult question of the extent of the state's power to condition the receipt of benefits on the renunciation of constitutionally protected rights. See Rust v. Sullivan, 500 U.S. 173, 197 (1991) (distinguishing constitutional conditions placed on uses of government funds by benefit recipients and unconstitutional conditions placed on recipients themselves); compare Rodney A. Smolla, The Reemergence of the Right-Privilege Distinction in Constitutional Law, 35 Stan. L. Rev. 69 (1982), with William W. Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L. Rev. 1439 (1968).

-5-

Bill 650 limits are not voluntary because they provide only penalties for noncompliance rather than an incentive for voluntary compliance. Therefore the state's reliance on the dicta in footnote 65 of <u>Buckley</u> is misplaced.

In the hypothetical set out in footnote 65, a candidate agreeing to limit his or her expenditures receives the benefit of public funding. Candidates who do not so agree do not receive public funding, but are not penalized for their reliance on private funding. Under Senate Bill 650, however, a candidate agreeing to abide by the spending limits receives no benefit other than the state's blessing to seek the private funding he or she would be free to seek in any event. At the same time, candidates who do not agree to abide by the spending limits are penalized in two ways: (1) the state makes it unlawful to seek important sources of private funding that otherwise they would be free to seek; and (2) the state requires daily reporting of expenditures. These penalties make the limits coercive, not voluntary. The state, however, does not believe that it is withdrawing an otherwise available source of funding; it characterizes the availability of organizational funding as the incentive that it offers to candidates to agree to abide by the spending limits. We disagree with the state's characterization.

From the state's perspective, it is providing complying candidates with a substantial benefit by "allowing" PACs, political parties, labor unions, corporations, and other organizations to make campaign contributions. The state's argument, however, assumes that it properly could ban such organizations from making any contributions to candidates running for state office. This assumption is incorrect. We believe it is clear that a ban on

campaign contributions by organizations would not survive a constitutional challenge.  See, e.g., Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 263 (1986) (striking down federal limitation on use of corporate funds in connection with federal elections as applied to nonprofit corporation); Day v. Holahan, 34 F.3d at 1365-66 (invalidating Minnesota's $100 limit on contributions from individuals and PACs).  We note that the Supreme Court has indicated that expenditure limits applied to organizations "impinge on protected associational freedoms" as well as freedom of speech.  Buckley, 424 U.S. at 22.  Thus the state's argument that it offers an incentive by allowing candidates to accept such contributions is disingenuous.  Organizational contributions are constitutionally protected irrespective of any agreement by a candidate to abide by the state-imposed expenditure limits.  No candidate would voluntarily agree to comply with the expenditure limits in exchange for access to sources of funding to which he or she already has a constitutional right of access.  Rather, Senate Bill 650 forces compliance by imposing substantial penalties for non-compliance.  The purported benefit is illusory, and the statute is coercive.

We therefore conclude that Senate Bill 650 "impose[s] direct and substantial restraints on the quantity of political speech," speech that is "at the core of . . . the First Amendment freedoms."  Buckley, 424 U.S. at 39 (internal quotation marks and citation omitted); see also Day v. Holahan, 34 F.3d at 1360 (holding that limits on independent expenditures infringe protected speech).  Even though the statute infringes protected speech, the statute nonetheless will be upheld "if the state can show that it is narrowly drawn to serve a compelling state interest."  Day v. Holahan, 34 F.3d at 1361; see also Austin, 494 U.S. at 657.  In this case the state has failed to meet its burden.

First the state argues that the "over-arching state interest" served by Senate Bill 650 is the reduction of corruption and the

appearance of corruption in the state's election process. State's Brief at 15. The state also refers to its related concerns with "the integrity of the [electoral] process," id. at 20, and public "confidence in the system of representative government," id. at 30 (quotation marks and citation omitted). While the state's interest in reducing corruption and its related concerns constitute a compelling state interest, the state has failed to explain how the campaign spending limits here in question are narrowly tailored to serve this interest or address these concerns. Indeed, we are hard-pressed to discern how the interests of good government could possibly be served by campaign expenditure laws that necessarily have the effect of limiting the quantity of political speech in which candidates for public office are allowed to engage. See Buckley, 424 U.S. at 55-57.

The state also argues that the expenditure limits are justified by its interests in (1) maintaining the individual citizen's participation in and responsibility for the conduct of government and (2) discouraging "the race toward hugely expensive campaigns, especially at the local level," State's Brief at 17-18. The state's interest in maintaining individual participation is what the District Court correctly described as an effort to "`level[] the playing field' between the rich and the poor." Shrink Missouri Gov't PAC, 892 F. Supp. at 1253. The Supreme Court in Buckley, however, specifically held that the government may not "restrict the speech of some elements of our society in order to enhance the relative voice of others," Buckley, 424 U.S. at 48-49, and no subsequent decision of the Court has undermined that holding.[4] With respect to the state's interest in keeping down the

_____

[4]Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990), is not to the contrary. While the Supreme Court upheld Michigan's restriction on independent expenditures by corporations in support of or in opposition to candidates for state office, the Court did not overrule Buckley and "hinted" that its decision was limited by the fact that the restriction applied only to independent expenditures by corporate entities and did not apply to such expenditures by individuals. See Lillian R. BeVier, Campaign Finance Reform: Specious Arguments, Intractable Dilemmas, 94 Colum. L. Rev. 1258, 1270 (1994).

costs of running for office, we note that the <u>Buckley</u> Court held that "the mere growth in the cost of . . . election campaigns in and of itself provides no basis for governmental restrictions on the quantity of campaign spending." <u>Buckley</u>, 424 U.S. at 57. This Court is not at liberty to disregard the explicit holdings of <u>Buckley</u>. We therefore hold that the state, having failed to show that the expenditure limits here at issue are narrowly drawn to serve a compelling state interest, has not justified the substantial burden that these limits place on speech that is at the core of the First Amendment.

Our analysis is not complete, however, because the state argues that the District Court should not have enjoined enforcement and implementation of sections 130.052 and 130.053 in their entirety. The state contends that several provisions can be implemented constitutionally despite the invalidity of the expenditure limits. These provisions include the requirement that candidates declare whether they will keep their expenditures within the unconstitutional limits, the unconstitutional limits themselves (described by the state for purposes of its severability argument as "the legislature's views as to the appropriate ceilings on expenditures," State's Brief at 30), and the disclosure requirements that are triggered by exceeding the unconstitutional limits. The state argues that these provisions should have been severed from the invalid parts of the statute. <u>See</u> Mo. Rev. Stat. § 1.140 (1994) (providing for general severability of all Missouri statutes).

The District Court did not address the severability of any remaining portions of Senate Bill 650 under Missouri law, <u>see</u> <u>Kinley Corp. v. Iowa Utilities Board</u>, 999 F.2d 354, 359 (8th Cir.

1993) (holding that questions regarding severability of state statutes are controlled by state law), but we think the proper response to the state's argument is clear: the remaining portions of sections 130.052 and 130.053 are not severable.

Once the unconstitutional portions of a statute are excised, the remainder can be upheld under Missouri law if it "is in all respects complete and susceptible of constitutional enforcement" and the court concludes that it would have been adopted even if it had been known that "the excluded portion was invalid." Millsap v. Quinn, 785 S.W.2d 82, 85 (Mo. 1990) (en banc). In Ryan v. Kirkpatrick, the Missouri Supreme Court left intact the remainder of the Campaign Finance Disclosure Law after invalidating one discrete provision. 669 S.W.2d 215, 219-20 (Mo. 1984) (en banc). That court held that the unconstitutional portions "are not so intertwined with [the law's] valid provisions as to leave it too enervated to stand." Id. In this case, the District Court did not invalidate all of Senate Bill 650; here the state asks us to leave intact portions of the very same discrete provisions that impose unconstitutional restraints on First Amendment rights. We cannot oblige the state. Every subsection of sections 130.052 and 130.053 makes some reference to the expenditure limits that we have held unconstitutional. The invalid portions are inextricably intertwined with the remainder of the statute. Moreover, the statute provides that "[c]ampaign expenditures shall be limited pursuant to this section" and that "[t]o be in compliance with the expenditure limits . . ., the following expenditure limits . . . may not be exceeded by a candidate committee." Mo. Ann. Stat. § 130.052 (Vernon Supp. 1995) (emphasis added). The state proposes that we convert this mandatory language into a non-binding legislative recommendation. The legislature, however, did not enact a set of suggestions.

In sum, any remaining valid provisions of sections 130.052 and 130.053 are not complete and susceptible of constitutional

enforcement and we cannot conclude that the legislature would have adopted them had it known the expenditure limits were unconstitutional. The District Court thus did not err when it enjoined the enforcement and implementation of sections 130.052 and 130.053 in their entirety.

C.

In Proposition A the citizens of Missouri adopted a measure designed to address the practice of carrying over "war chests" of campaign funds for future elections.[5] Under the ballot initiative measure, within ninety days of an election a candidate must turn over any excess funds, "except for an amount no greater than ten times the individual contribution limit" for the office sought, to the Missouri Ethics Commission or to contributors. Mo. Ann. Stat. § 130.130 (Vernon Supp. 1995). This is popularly known as a "spend-down provision" because candidates will most likely choose to spend all of their funds during the last days of the campaign rather than returning funds to contributors or turning them over to the state. The ability of a candidate to retain contributions for future elections is thus substantially limited.

The District Court held that the spend-down provision imposes a substantial burden on political speech by requiring that funds raised during a particular campaign be spent during the campaign. The court rejected the state's assumption that "blind support" in the form of a contribution that can be used in the current campaign or any future campaign "must constitute an impermissible attempt at improper quid pro quo influence." Shrink Missouri Gov't PAC, 892 F. Supp. at 1254. The state, on the other hand, argues that the spend-down provision does not limit speech but encourages it by

_____

[5]The legislature, in Senate Bill 650, earlier adopted a similar, but less restrictive, measure. See Mo. Ann. Stat. § 130.038 (Vernon Supp. 1995). Only the Proposition A "war chest" limitation is challenged in this case.

requiring candidates "to do precisely what the contributors intend: to speak." State's Brief at 38. In our opinion, the state's argument makes an unwarranted assumption about the intention of campaign contributors and badly misrepresents reality. Some contributors undoubtedly do intend to give a candidate "blind support," and they do so without any hope of gaining improper influence with that candidate. Beyond that, we believe the state's characterization of the provision confirms the District Court's decision that it infringes the First Amendment. From the state's perspective, the provision is intended to require the candidate to speak in the current election. We note that "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." Wooley v. Maynard, 430 U.S. 705, 714 (1977). From the appellees' perspective, the provision limits the quantity of a candidate's speech in future elections. We note that this effect is identical to the effect of the expenditure limits addressed earlier in this opinion except that the impact of the provision is postponed to future elections. Whether we accept the state's or the appellees' characterization of the spend-down provision is irrelevant. Either way, we conclude that rights protected by the First Amendment are implicated and that the provision must be subjected to strict scrutiny.

While strict scrutiny may not always be fatal to a challenged restriction on speech, it is in this case. The state has not demonstrated that the spend-down provision is narrowly tailored to serve a compelling government interest. The state argues that this provision serves three interests.

> First, it attacks corruption and its appearance by (1) preventing the kinds of quids pro quo that occur when money is given to candidates in uncontested races, and (2) ensuring that the contributions limits of Proposition A . . . have a measurable effect on the political system . . . . Second, it preserves the integrity of the electoral process by (1) counterbalancing any

-12-

discriminatory effects against challengers and in favor of incumbents that are created by Proposition A's contribution limits, (2) ensuring the opportunity of all citizens, not just those who have amassed large war chests in noncompetitive races, to participate in the political process as candidates, and (3) protecting the free speech interests of contributors. Third, it promotes speech and fairness, thus sustaining the active, alert responsibility of the individual citizen in our democracy.

State's Brief at 38-39 (citations omitted). At the outset, we note that any interest related to the effective operation of Proposition A's contribution limits fails to qualify as compelling because we have held that those limits are unconstitutional. See Carver v. Nixon, slip op. at 25. We further note that any interest defined by reference to funds raised in "noncompetitive" or "uncontested races" is unhelpful because the spend-down provision applies to funds raised in all campaigns; thus the provision is not narrowly tailored to serve such an interest. The sole remaining interests asserted by the state are that the provision "preserves the integrity of the electoral process by . . . protecting the free speech interests of contributors" and that it "promotes speech and fairness, thus sustaining the active, alert responsibility of the individual citizen in our democracy." Assuming that the state has articulated compelling interests, we conclude that the state has failed to demonstrate that the spend-down provision is narrowly tailored to do either of the things that the state asserts it will do. Although the state asserts that the provision protects the free speech interests of contributors, it is just as likely that the provision infringes those interests. Surely the contributor's political free speech interests are not well served if a candidate is compelled (1) to waste campaign contributions on unnecessary speech (in order to spend down the campaign's accumulated assets) or (2) to turn over those contributions to the Missouri Ethics Commission or return them to contributors. With respect to the provision's impact on the "active, alert responsibility of the individual citizen," the state's arguments are broad and

conclusory. The state makes no attempt to show how the spend-down provision is narrowly tailored to serve that interest, saying only that "[c]itizens now may decline to participate in a particular race . . . because of the overwhelming advantage carried over from another day" and that the "carryover restriction may well be the difference between having noncompetitive races, in which there is little or no speech, and having active campaigns in which there is uninhibited, robust, and wide-open debate on public issues," State's Brief at 45 (internal quotation marks and citation omitted). These statements fall far short of a showing that the spend-down provision is narrowly tailored to promote "the active, alert responsibility of the individual citizen in our democracy." We conclude that section 130.130 cannot withstand strict scrutiny and that it violates freedoms that the First Amendment protects.

                              III.


     In sum, we hold that the expenditure limits of Senate Bill 650 and the spend-down provision of Proposition A restrict expression protected by the First Amendment and that the state has not demonstrated that these provisions are narrowly tailored to serve a compelling government interest. Furthermore, based on this Court's decision in Carver v. Nixon, slip op. at 25, which holds that Proposition A's contribution limits are facially unconstitutional, we conclude that those limits are necessarily unconstitutional insofar as they would limit contributions by candidates to their own campaigns. The judgment of the District Court enjoining the Attorney General of Missouri and the Chair of the Missouri Ethics Commission from implementing, enforcing, or acting in reliance on the challenged provisions is therefore affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.