Ronald SUSTER, et al., Plaintiffs,

v.

Jonathan W. MARSHALL,
et al., Defendants.

No. 1:96 CV 1736.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 25, 1996.

Mark A. Ferguson and Timothy J. Grendell, Taft, Stettinius & Hollister, Columbus, OH, for Plaintiffs.

Michael J. Renner and Olivia O. Singletary, Office of the Attorney General, Chief Counsel's Staff, Columbus, OH, for Defendants.

### AMENDED ORDER

OLIVER, District Judge.

Plaintiffs Ronald Suster and Patricia Cleary, both of whom currently serve as Judges on the Cuyahoga County Court of Common Pleas, bring this action against the following defendants: (1) Jonathan Marshall, Secretary of the Ohio Supreme Court Board of Commissioners on Grievances and Discipline ("Discipline Board"); (2) Robin Weaver, Chair of the Discipline Board; (3) David Evans, Vice Chair of the Discipline Board; and (4) all seven of the current Ohio Supreme Court Justices. Plaintiffs Suster and Cleary bring this action to challenge the constitutionality of provisions in the Ohio Code of Judicial Conduct that limit judicial campaign expenditures.

Currently pending is plaintiffs' motion for preliminary injunction (docket no. 3). On September 3, 1996, the Court heard oral argument regarding this motion. For the reasons stated below, the motion for preliminary injunction is **GRANTED IN PART and DENIED IN PART.** In particular, the Court enjoins enforcement against plaintiffs of Canon 7(C)(6) of the Ohio Code of Judicial Conduct, which places a ceiling on the amount of funds a candidate may spend during a judicial race, finding that Canon unconstitutional, but does not enjoin enforcement of Canon 7(C)(8), which prohibits a candidate in a judicial race from utilizing funds raised while running for non-judicial offices.

### I. *Findings of Fact.*

None of the material facts in this case are in dispute. As noted, plaintiffs Ronald Suster and Patricia Cleary are both currently serving as Judges on the Cuyahoga County Court of Common Pleas. Judge Suster was appointed to this position in October of 1995; prior to that time, he served as an elected member of the Ohio House of Representatives. Judge Suster's term as Judge expires on December 31, 1996. Judge Cleary was elected to her position in 1994, and her term ends on December 31, 2000. Both plaintiffs are attorneys and registered voters in Cuyahoga County.

Suster is currently seeking to retain his position as Judge by running for election. Judge Suster won the primary election on March 19, 1996, and is now campaigning for the general election, to be held November 5, 1996. As an incumbent Judge and candidate for judicial office, he is subject to the Ohio Code of Judicial Conduct ("Judicial Code"). The Judicial Code is promulgated by the seven Ohio Supreme Court Justices named as defendants. Defendants Marshall, Weaver, and Evans have primary responsibility for initiating enforcement of the Judicial Code, through their initial review of all grievances relating to Judicial Code violations. Violations of the Judicial Code may lead to disciplinary sanctions, fines, and related punishment.

Canons 7(C)(6)(d) [1] and 7(C)(8) of this Judicial Code limit the amounts and sources of funds that a judicial candidate may spend during a judicial campaign. Specifically, Canon 7(C)(6)(d) states in relevant part that "[t]he total amount of expenditures made in the fund raising period ... by the campaign committee of a judicial candidate shall not exceed ... [s]eventy-five thousand dollars in the case of a judicial candidate for the court of common pleas." Canon 7(C)(8) states, *inter alia*, that "[a] judicial candidate shall not expend funds in a judicial campaign that have been contributed to him or her to promote his or her candidacy for a nonjudicial office." [2] Suster and Cleary challenge these provisions, seeking: (1) a declaratory judgment that the provisions violate their right to free speech, guaranteed by the First Amendment to the Constitution; (2) a declaratory judgment that the provisions violate their right to substantive due process; and (3) damages and attorney's fees, pursuant to 42 U.S.C. §§ 1983 and 1988.

In their role as judges, both Suster and Cleary challenge Canon 7(C)(6) as violative of their First Amendment rights. Suster has already spent about $73,000 during his primary campaign. Thus, under Canon 7(C)(6)(d), Suster may spend only about $2,000 more before he reaches his limit. Because Suster wants to spend more than an additional $2,000 pursuing his campaign during the general election, he challenges this provision. Cleary adds that she wants to spend more than a total of $75,000 when she

runs for re-election in 2000, so she challenges this provision as well.

Also in his role as judge, Suster alone challenges Canon 7(C)(8) as violative of his First Amendment rights. Suster successfully ran for election as a state representative, he maintained a campaign committee called "Friends of Ron Suster." This committee managed a bank account into which it placed campaign contributions. Today, the committee's bank account still contains a positive cash balance of about $54,000. Suster would now like to spend some or all of this money on his present judicial campaign, but he is limited from doing so by Canon 7(C)(8). Thus, he challenges the limitation that he may not spend campaign funds raised during his past campaign for election as state representative on his present campaign for election as judge.

Finally, in their role as registered voters, Suster and Cleary challenge both Canons as violative of their First Amendment rights. Suster and Cleary note they are registered to vote in Cuyahoga County. In their role as potential voters—not as judicial candidates—Suster and Cleary complain that the challenged Canons serve to abridge the total amount of campaign speech a judicial candidate may utter. Plaintiffs avow that, as voters, they would like to consume as much political campaign speech as judicial candidates might wish to express. Thus, plaintiffs challenge both spending limits as violations of their right to hear political speech.[3]

---

1. Although the parties refer in their briefs to Canon 7(C)(6)(a)(iv), they mean to cite Canon 7(C)(6)(d). Canon 7(C)(6)(a)(iv) was renumbered to be Canon 7(C)(6)(d) when the Canon was amended on February 20, 1996. This amendment, in turn, was brought about when plaintiff Suster challenged the Judicial Code's then-existing spending limits applicable to *primary* elections. *See Suster v. Board of Comm'rs on Grievances & Discipline of the Supreme Ct. of Ohio*, Case No. 96–CV–0235 (N.D.Ohio Feb. 20, 1996) (Gaughan, J.) (*"Suster I "*). *Suster I* was resolved when the defendants in that case signed a Final Consent Decree agreeing not to enforce Canons 7(C)(6)(b & c) (July 1, 1995), which, *inter alia*, had limited Suster's primary campaign spending to $18,750. The same day Judge Gaughan entered this Final Consent Decree in *Suster I*, the Ohio Supreme Court, over Justice Pfeiffer's dis-

sent, amended Canon 7 to delete provisions 7(C)(6)(b & c) (July 1, 1995), which led to the renumbering.

2. Canon 7(C)(8) goes on to state: "A judge or judicial candidate shall not contribute or expend campaign funds in support of or opposition to a candidate for a public office, other than the public office to which the judge or judicial candidate is seeking election." Defendants do not challenge this portion of Canon 7(C)(8).

3. Defendants suggested at oral argument that plaintiff Cleary may not have standing to pursue the claims advanced in the complaint. The Court does not address this issue because it is clear that plaintiff Suster, at least, does have standing to pursue all claims made.

## II. *Conclusions of Law.*

■ This Court must consider and balance the following four factors in deciding whether to issue a preliminary injunction:

(1) whether the plaintiff has a substantial likelihood of success on the merits;

(2) whether the plaintiff will suffer irreparable injury if the relief is not granted;

(3) whether the order would cause substantial harm to others; and

(4) whether the public interest would be served by issuing the order of injunction.

*Mason Cty. Med. Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). These four factors "do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief." *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985). Rather, they are "factors to be balanced, not prerequisites that must be met." *Id.* In this regard, no single factor is determinative. The Court must weigh and balance each of these factors in light of the factual circumstances of the particular case. *Columbia Gas Transmission Corp. v. An Exclusive Natural Gas Storage Easement,* 688 F.Supp. 1245, 1248 (N.D.Ohio 1988). A balancing of these four factors in this case demonstrates that plaintiffs are entitled to part, but not all, of the injunctive relief they seek.

### A. *Canon 7(C)(6).*

#### 1. *Likelihood of Success on the Merits.*

■ The legal analysis for any challenge to laws governing campaign finances must start with *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In *Buckley,* the Supreme Court examined certain federal campaign expenditure ceilings and campaign contribution restrictions. The High Court determined that "[political campaign] contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities." *Id.* at 19, 96 S.Ct. at 634. The Court stated that "[a] restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audi-

ence reached." *Id.* Because such restrictions "burden[ ] core political speech, [a court must] apply 'exacting scrutiny,' and ... uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, ——, 115 S.Ct. 1511, 1519, 131 L.Ed.2d 426 (1995).

As of 1985, the only "legitimate and compelling government interests thus far identified for restricting campaign finances" by the Supreme Court were "preventing corruption or the appearance of corruption." *Federal Election Comm'n v. National Conservative Political Action Comm.,* 470 U.S. 480, 496–97, 105 S.Ct. 1459, 1468, 84 L.Ed.2d 455 (1985) (*"NC–PAC"*). In 1990, the Supreme Court identified an additional interest, limiting "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 660, 110 S.Ct. 1391, 1397, 108 L.Ed.2d 652 (1990). This latter compelling state interest is not implicated in this case.

■ The Supreme Court thus teaches that a statute may constitutionally restrict campaign finances to prevent corruption or the appearance of corruption, but the statute must do so in a narrowly tailored way. Moreover, a statute tending to infringe First Amendment freedoms must be so narrowly tailored that it infringes those freedoms by the least restrictive means possible. *Anderson v. Celebrezze,* 460 U.S. 780, 806, 103 S.Ct. 1564, 1579, 75 L.Ed.2d 547 (1983) ("[i]f the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a ... scheme that broadly stifles the exercise of fundamental personal liberties"); *see also Brown v. Hartlage,* 456 U.S. 45, 54, 102 S.Ct. 1523, 1529, 71 L.Ed.2d 732 (1982) (a "restriction [must] operate without unnecessarily circumscribing protected expression").

■ In its analysis of the compelling state interest of preventing corruption, the Supreme Court has noted that "[t]he hallmark

of corruption is the financial quid pro quo: dollars for political favors." *NC–PAC,* 470 U.S. at 497, 105 S.Ct. at 1468. As such, limits on the amount of money an entity may contribute to a candidate's campaign may be, if narrowly tailored, constitutional. *E.g., Buckley,* 424 U.S. at 29, 96 S.Ct. at 639–40 (upholding limits on the amount of money a person can contribute to the campaign of a candidate for certain elected federal positions). The reason behind contribution limits is obvious—extremely large contributions may, or at least will appear to, buy political influence. Narrowly tailored limits on the size of campaign contributions, therefore, are constitutionally permitted to avoid corruption, even though such limits may serve to reduce the total amount of money a candidate has available for disseminating his political speech.

■ Limits on campaign *contributions,* however, are qualitatively different from limits on campaign *expenditures.* There is a "fundamental constitutional difference between money spent to advertise one's views ... and money contributed to the candidate to be spent on his campaign." *NC–PAC,* 470 U.S. at 497, 105 S.Ct. at 1469. A cap on the amount a candidate may spend in pursuit of elected office has little nexus to prevention of corruption or its appearance: unlike a campaign contributor, a candidate's dollars are traded not for possible political favors but for "political communication" through buying handbills, hiring halls for speeches and rallies, and purchasing advertising in broadcast and print media. *Buckley,* 424 U.S. at 19, 96 S.Ct. at 634–35. Thus, not even the governmental interest of preventing corruption or the appearance of corruption will normally "justify the restriction on the quantity of political expression imposed by ... campaign expenditure limitations." *Id.* at 55, 96 S.Ct. at 652. As the Eighth Circuit noted recently, it is difficult "to discern how the interests of good government could possibly be served by campaign expenditure laws that necessarily have the effect of limiting the quantity of political speech in which candidates for public office are allowed to engage." *Shrink Missouri Government Political Action Comm. v. Maupin,* 71 F.3d 1422, 1426 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2579,

135 L.Ed.2d 1094 (1996) (noting also that although "the state's interest in reducing corruption ... constitute[s] a compelling state interest, the state has failed to explain how the campaign spending limits ... are narrowly tailored to serve this interest").

■ In the face of this overwhelming authority disfavoring the campaign spending limits contained in Canon 7(C)(6), defendants attempt to distinguish *Buckley, Shrink Missouri,* and other such cases by arguing that those cases addressed only campaign spending on *non-judicial* elections. Defendants argue that "judicial election speech" is different from "legislative election speech," and that limiting the former through campaign spending limits is different from limiting the latter because of aspects unique to the position of judge.

In support of this notion, defendants quote case law stating that "[b]ecause the judicial office is different in key respects from other offices, the state may regulate its judges with the differences in mind." *Morial v. Judiciary Comm'n of State of Louisiana,* 565 F.2d 295, 302 (5th Cir.1977) (en banc), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978). As examples, defendants note that states may: forbid judicial candidates from identifying their party affiliation on the ballot, *Haffey v. Taft,* 803 F.Supp. 121, 125–26 (S.D.Ohio 1992); prohibit judges from publicly endorsing other candidates for public office, *In re Code of Judicial Conduct,* 603 So.2d 494, 498–99 (Fla. 1992); disallow judicial candidates from personally soliciting campaign contributions, *Stretton v. Disciplinary Bd. of Supreme Ct. of Pennsylvania,* 944 F.2d 137, 144 (3rd Cir. 1991); and ban judicial candidates from announcing their views on disputed legal or political issues likely to come before them as judges, *id.* at 146. Such restrictions on candidates for *non-judicial* office, of course, would almost certainly be unconstitutional. *See id.* at 142 (the state's "right to restrict the speech of its candidates for legislative and executive offices does not extend so far as to 'select which issues are worth discussing or debating' ... in the course of the campaign") (quoting *Brown,* 456 U.S. at 45,

60, 102 S.Ct. at 1532) (some internal quotation marks omitted).

Although defendants construct an interesting argument, the Court does not find it persuasive. The cases cited by defendants are directed to regulations governing the permissible *content* of a judicial candidate's speech. Canon 7(C)(6) does not regulate content, but regulates the *quantity* of a judicial candidate's speech.[4] Narrowly tailored regulation of the content of a judicial candidate's speech has been held constitutional because such regulations can serve to avoid the appearance of corruption. As an example, a judicial candidate's campaign promise always to rule in favor of employers in labor disputes is practically a solicitation of dollars from employers, in exchange for favorable rulings. Restrictions on campaign speech prohibiting a judicial candidate from announcing his views on "disputed legal or political issues ... likely to come before the court" are permissible, therefore, to avoid this apparent and real quid pro quo corruption. *Stretton*, 944 F.2d at 144.

Defendants cite no case, and the Court cannot find one, standing for the proposition that regulations which, through campaign spending limits, restrict the *quantity* of speech a judicial candidate is otherwise allowed to express, are constitutional. The reason for this, as noted, is that there is virtually no link between campaign expenditure limits and the prevention of corruption. Regardless of whether a candidate is pursuing judicial, legislative, or executive office, any political favors he might owe correlate with the size of his campaign contributions, not the size of his expenditures. Because the Canon challenged here is directed entirely toward limiting the quantity of a judicial

candidate's political speech, not its content, the cases cited by defendants are largely inapposite.

 This is not to say defendants have failed to identify any important state interests that the challenged Canons might serve. One such interest identified by defendants is having "judges be judges, not campaign managers." It is fair to say that a state has a legitimate and strong interest in ensuring scarce judicial resources be directed as much as possible toward resolving disputes brought to its courts, not in election efforts. *See* Note, *Popular Justice: State Judicial Elections and Procedural Due Process*, 31 Harvard C.R.–C.L. L.Rev. 187, 193–95 (1996) (demonstrating that judicial campaigns have become increasingly time-consuming and expensive, and citing the example that "[i]n 1986, two candidates for chief justice of the Supreme Court of Ohio spent in excess of $2,700,000, up from $100,000 six years earlier"). Defendants also assert the substantial state interest of ensuring the independence of the state judiciary and public confidence and trust in its elected judges. These are also strong and legitimate state interests, about which defendants are rightly concerned. In fact, defendants cite a poll of Ohio citizens, undertaken by the Citizen's Committee on Judicial Elections,[5] which reports that: (1) 90% of the citizenry believe judicial decisions are influenced by campaign contributions at least some of the time; and (2) these citizens believe limiting total campaign spending is the most effective way to alleviate this problem. This poll reveals that public confidence in its elected judiciary is sadly low, and the Court accepts that the

---

**4.** Compare Canon 7(B)(2)(b–f) of the Judicial Code, which regulates the content of a judicial candidate's speech.

**5.** The Citizen's Committee on Judicial Elections was established by the Ohio Supreme Court in 1994 to conduct a thorough review of Ohio's judicial election system. The Committee issued its report, known as the "McQuade Report" (named after the Committee Chairman, Judge Richard B. McQuade, Jr.), in January of 1995. The Committee suggested a number of reforms to

the Judicial Code to increase the public's trust in its judiciary. Interestingly, however, the McQuade Report did *not* propose campaign expenditure limits, noting that "mandatory expenditure limits in non-judicial races have been determined to be unconstitutional." Report at 7. *See also* letter from Richard B. McQuade to Ohio Chief Justice Thomas Moyer (March 29, 1995) (stipulation exhibit 8) (explaining at length why the Citizen's Committee on Judicial Elections believed campaign spending limits were unconstitutional and bad policy).

State does have a substantial interest in securing public trust in the judiciary.[6,7]

█ Even assuming these state interests are "compelling" and "overriding," however, defendants have failed to show that the restrictions placed upon a judicial candidate's campaign speech by Canon 7(C)(6) are "narrowly tailored" to serve these interests. *McIntyre*, 514 U.S. at ——, 115 S.Ct. at 1519. As noted, the exacting scrutiny this Court must apply requires the Canon to serve the state's interests by the least restrictive means possible. *Anderson v. Celebrezze*, 460 U.S. 780, 806, 103 S.Ct. 1564, 1579, 75 L.Ed.2d 547 (1983). In this case, it does not. Regarding the first state interest, the Canon does not ensure that "judges will be judges, not campaign managers." When judges are elected, not appointed, they are obliged to manage an election campaign. This is true regardless of how much they may be allowed to spend. Indeed, an argument may be made that judges will have to spend *more* time campaigning under a $75,-000 campaign expenditure limit than under no limit—judges will be forced to make up for lack of wide-dispersion speech, via expensive television ads, by spending even more time making numerous speeches to smaller groups.

Further, defendants have not shown, and cannot show, that campaign expenditure limitations in and of themselves ensure the independence of the judiciary. The Supreme Court has stated clearly that while limiting campaign *contributions* may ensure the independence of elected candidates, by limiting the opportunity for "quid pro quo" political favors, limits on campaign *expenditures* do not have any direct nexus to this type of corruption. *Buckley*, 424 U.S. at 54–57, 96

S.Ct. at 651–53; *see also Shrink Missouri*, 71 F.3d at 1426. Limiting the size of campaign contributions can ensure a judge is not beholden to a large contributor; limiting the candidate's expenditures does not have this effect. Thus, the limit on total campaign expenditures imposed by Canon 7(C)(6) is simply not narrowly tailored to achieve the state interest of ensuring the independence of the judiciary.

Finally, the defendants have not shown Canon 7(C)(6) is narrowly tailored to improve the public's confidence and trust in its elected judges. To the contrary, the Canon is not tailored toward serving this interest at all— the spending limits as promulgated apply to judicial candidates extremely unequally. For example, a candidate for judge in the court of common pleas in Cuyahoga County, which has a population of over 900,000 registered voters, is limited to spending 8.3 cents per voter; a candidate in Vinton County, which has about 7,500 registered voters, is limited to spending $10 per voter.[8] Presumably, a voter could thus trust a candidate from Cuyahoga County more than one from Vinton County. This is not "narrow tailoring." Moreover, in summarizing the results of the citizens poll, the accompanying report notes that "spending limits can provide an undue advantage to incumbents and candidates with well-known names." McQuade Report at 7. As such, campaign spending limits carry their own problems and may not improve the public's trust in its judges at all. Finally, it appears there are available more narrowly tailored methods of improving the public's confidence that elected judges will not favor campaign contributors, not the least of which include enforcing and publicizing existing

---

6. Loss of the public trust in the elected judiciary, however, is not new. Ninety years ago, Roscoe Pound noted that "Putting courts into politics, and compelling judges to become politicians, in many jurisdictions has almost destroyed the traditional respect for the bench." *See* Note, *Merit Appointment Versus Popular Election: A Reformer's Guide to Judicial Selection Methods in Florida*, 43 Fla.L.Rev. 529, 535 (1991) (citation omitted).

7. Defendants cite a third state interest in support of the challenged provisions: to "level the playing field" between judicial candidates. The Su-

preme Court, however, has clearly stated that "leveling the playing field" is not a compelling state interest: campaign spending limits are not justified by a desire to "enhance the relative voice" of some candidates over others. *Buckley*, 424 U.S. at 48–49, 96 S.Ct. at 648–49.

8. Defendants' counsel graphically illustrated this difference at oral argument by noting that the Cuyahoga County candidate could not send a postcard to each voter, while the Vinton County candidate could buy each voter a (tough) steak dinner.

rules regarding contribution limits,[9] or mandating a judge's recusal if a party or attorney has made campaign contributions of a certain size.[10]

In the end, overwhelming and recent case law shows that rules limiting the total amount of judicial campaign expenditures, as does Canon 7(C)(6), are unconstitutional as a violation of the right to free speech.[11] *E.g., Shrink Missouri,* 71 F.3d at 1426 (no compelling state interests are "served by campaign expenditure laws that necessarily have the effect of limiting the quantity of political speech in which candidates for public office are allowed to engage"). Canon 7(C)(6) does not withstand the "exacting scrutiny" required to pass constitutional muster. As to this Canon, therefore, plaintiffs have a very high likelihood of success on the merits.

### 2. Other Factors.

■ There is little question that a violation of plaintiffs' right to free speech is an irreparable injury. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); *see also Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir.1989) ("even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief").

Also, there appears to be no substantial harm that would come to others if the injunction is granted. Defendants have identified no one whom an injunction would injure.

There would certainly be no injury to plaintiffs' election opponents; an injunction declaring unconstitutional, and prohibiting enforcement of, a campaign expenditure cap would affect all judicial candidates equally.

Finally, the public interest would certainly be served by issuing an order enjoining enforcement of a rule that serves to limit "core political speech." *McIntyre,* 514 U.S. at ——, 115 S.Ct. at 1519. There is no public interest in enforcing a law that "curtail[s] debate and discussion" regarding issues of political import. *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, Cal.,* 454 U.S. 290, 299, 102 S.Ct. 434, 438–39, 70 L.Ed.2d 492 (1981).

■ Because all of the four factors the Court must consider and balance in deciding whether to issue a preliminary injunction regarding Canon 7(C)(6) weigh in favor of plaintiffs, the preliminary injunction is **GRANTED,** as follows: (1) the Court declares that Canon 7(C)(6) of the Ohio Code of Judicial Conduct is unconstitutional; and (2) defendants are hereby enjoined from enforcing Canon 7(C)(6) of the Ohio Code of Judicial Conduct against plaintiffs.[12]

### B. Canon 7(C)(8).

### 1. Likelihood of Success on the Merits.

■ Sentence one of Canon 7(C)(8) prohibits a judicial candidate from spending funds on a campaign for judicial office if those funds were raised while campaigning for a non-judicial office. Such a shifting of funds raised during one campaign to support

9. For example, a non-family individual may not contribute more than $250 to the campaign of a judicial candidate for county court. Canon 7(C)(5)(a)(i).

10. Current rules regarding recusal are contained in Canon 3(C, D).

11. Academic articles add that rules limiting the total amount of judicial campaign expenditures are probably ineffective, as well. *See* Roy A. Schotland, *Elective Judges' Campaign Financing: Are State Judges' Robes the Emperor's Clothes of American Democracy?,* 2 J. of Law & Politics 57, 121–22 (1985) (reciting numerous reasons campaign spending caps do not work).

12. The Court grants injunctive relief in favor only of plaintiffs, and not other judges against

whom defendants might seek to enforce Canon 7(C)(6), because the Court "may not attempt to determine the rights of persons not before the court ... [and] must, therefore, tailor the injunction to affect only those persons over which it has power." *Zepeda v. United States I.N.S.,* 753 F.2d 719, 727 (9th Cir.1983). *See also Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979) (injunction should be "narrowly tailored to give only the relief to which plaintiffs are entitled"); *Brown v. Trustees of Boston Univ.,* 891 F.2d 337, 361 (1st Cir.1989), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990) ("classwide relief ... is appropriate only where there is a properly certified class").

another campaign is generically known as "intra-candidate transfers." *Service Employees Int'l Union v. Fair Political Practices Comm'n*, 955 F.2d 1312, 1315 (9th Cir. 1992), *cert. denied*, 505 U.S. 1230, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992). It is clear that a ban on such transfers works to limit political speech: if plaintiff Suster could use, during his present judicial campaign, the $54,000 he raised while campaigning for election to the state legislature, he could give voice to more "political communication" through buying postage for campaign literature, hiring halls for rallies, and purchasing advertising. *Buckley*, 424 U.S. at 19, 96 S.Ct. at 634–35; *Service Employees*, 955 F.2d at 1322. As with Canon 7(C)(6), then, Canon 7(C)(8) infringes upon plaintiffs' First Amendment rights by limiting total campaign expenditures. Accordingly, Canon 7(C)(8) must be declared unconstitutional unless "it is narrowly tailored to serve an overriding state interest." *McIntyre*, 514 U.S. at ——, 115 S.Ct. at 1519.

In support of their position that Canon 7(C)(8) is not narrowly tailored, and thus that they are likely to win on the merits, plaintiffs cite *Service Employees* and *Shrink Missouri*. Both of these cases involved challenges to, *inter alia*, provisions prohibiting intra-candidate transfers.[13] In both cases, the elected officials whom the statutes prohibited from engaging in intra-candidate transfers included judges.[14] And in both cases, the courts struck down the statutes prohibiting transfers, holding the statutes were unconstitu-

tional. Specifically, the *Service Employees* court ruled:

> It is clear that the ban acts as an expenditure limitation; such limitations have never been upheld, save in connection with the expenditures of corporations [referring to *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990)]. Moreover, the sole justification offered for the [intra-candidate] transfer ban, is a notion that contributions given for one office ought not be diverted to another, because the donation was solicited and given with a particular office in mind. This "trust" theory, which suggests donations are premised upon the office rather than the candidate, may, of course, sometimes be true; on the other hand, as evidence in this trial demonstrated, it is sometimes false. More to the point, it is clear that to the extent the provision is intended to insure truth in soliciting, a narrower and more efficacious means is readily at hand. Such a purpose is easily served by requiring that the candidate inform potential donors of his intentions, or if he is unable to do so, to acknowledge that the sums raised could be expended on other races.

*Service Employees v. Fair Political Practices Commission*, 747 F.Supp. 580, 591 (E.D.Cal.1990); *see also Service Employees*, 955 F.2d at 1322 (agreeing with the district court's analysis).

Similarly, the *Shrink Missouri* court held:

---

**13.** The statute at issue in *Service Employees* prohibited "transfer of funds between controlled committees of a single candidate." *Service Employees*, 955 F.2d at 1315. The statute at issue in *Shrink Missouri* prohibited a candidate from "carry-over from one campaign to the next of any but very small amounts of funds," by mandating that money raised but not spent during a campaign be returned to contributors or forfeited to the state ethics commission. *Shrink Missouri Government PAC v. Maupin*, 892 F.Supp. 1246, 1250 (E.D.M.1995); *Shrink Missouri*, 71 F.3d at 1427.

**14.** Contrary to defendants' suggestion at oral argument, the Missouri statute challenged in *Shrink Missouri* applied to all elected officials, including judges. Missouri amended its State Constitution in 1976 to provide that Justices and Judges are *initially* appointed to the state Supreme Court and certain lower courts. These

judges must run for re-election, however, and other judges are popularly elected both initially and thereafter. Office of the Secretary of State of the State of Missouri, *Official Manual: State of Missouri 1995–1996* 192 (1995) (Steven N. Ahrens, ed.); *see also* 30 The Council of State Governments, *The Book of the States* 190–92 (1994–95) (the fifty States either (1) popularly elect their judges, (2) select judges by legislative or executive appointment, or (3) use a hybrid approach; Missouri uses the third method). The ruling in *Shrink Missouri*, therefore, applied to judicial *and* non-judicial elections. The California statute challenged in *Service Employees* also applied to all elected officials, including judges. *See* Cal.Govt.Code § 82023 (" 'Elective office' means any state, regional, county, municipal, district *or judicial office* which is filled at an election") (emphasis added).

The [laws banning intra-candidate transfers] clearly limit political speech by telling a candidate *when* he or she must speak, that is, by stating that the money must be spent in the particular campaign in which it was raised. Defendants assume that contributors always wish to contribute to a candidate for a particular campaign, and that a general contribution to a candidate, which that candidate could use for current or future campaigns, must constitute an impermissible attempt at improper *quid pro quo* influence. The Court disagrees, and thinks it is entirely legitimate for a contributor to give money to a candidate because the contributor supports that candidate, in whatever race the candidate may later choose to run. This type of "blind support" does not necessarily imply that the contributor expects favors, but rather that the contributor supports the candidate because of the candidate's particular views or politics—the very essence of protected political speech. The dangers of *quid pro quo* corruption are adequately addressed by the overall contribution limits [contained in the statute].

*Shrink Missouri*, 892 F.Supp. at 1254 (emphasis in original); *see also Shrink Missouri*, 71 F.3d at 1427–28 (agreeing with the district court and noting that the statute was not narrowly tailored).

*Service Employees* and *Shrink Missouri* do lend support to plaintiffs' position. This Court finds both cases distinguishable, however, because neither case focused on the peculiarities of the elected position of judge. In neither case were any of the litigants judicial candidates.[15] Thus, in neither case did the parties argue, nor did the courts consider, the more particular compelling state interest of avoiding corruption or the appearance of corruption *of elected judges*. Both the *Service Employees* and *Shrink Missouri* courts heard arguments from candidates to *non-judicial* elected office, and ruled that provisions limiting intra-candidate transfers were unconstitutional as applied to *all* elected offices. Given that plaintiffs in this case are judges, the Court has been presented with meaningfully different arguments.

Specifically, the defendants offer the compelling state interest that prohibition of intra-candidate transfers ensures judicial candidates do not violate other Canons of the Judicial Code, which govern judicial campaigning. As examples, defendants note that other provisions of the Judicial Code restrict a judicial candidate's speech in the following ways: (1) limiting to $250 the amount an individual, other than a family member, may contribute to a candidate's campaign for judge on a court of common pleas, Canon 7(C)(5)(a)(i); (2) prohibiting candidates from promising how they will rule on matters that may come before them, or even expressing views on such matters, Canon 7(B)(2)(c-e); and (3) prohibiting candidates from soliciting campaign funds personally, Canon 7(C)(2)(a).

Defendants then correctly note that Canon 7(C)(8), which bans intra-candidate transfers, helps to ensure judicial candidates will not avoid the restrictions contained in these other Canons. For example, a person who runs for state *legislative* office (as has plaintiff Suster) may legally: (1) endorse the death penalty for all felons who deal drugs, or alternatively endorse commutation of all current death penalty sentences to life in prison; (2) write personal letters soliciting campaign funds based on his death penalty views; and (3) accept two $2,500 campaign contributions from an individual who responds favorably to his letter.[16] The Judicial Code prohibits a candidate for *judicial* office from doing any of these things. Defendants thus argue that Canon 7(C)(8) serves the compelling state interests of: (1) ensuring the integrity of the judiciary; and also (2) ensuring fairness be-

---

**15.** In *Service Employees*, plaintiffs included "a number of elected state officials, various campaign committees, labor organizations, and a contributor to political campaigns," as well as intervenor plaintiff the Democratic Party, 747 F.Supp. at 581. In *Shrink Missouri*, plaintiffs included two candidates who had run for legislative office and also a political action committee, 892 F.Supp. at 1248.

**16.** A candidate for the state legislature may accept a $2,500 contribution from an individual during the campaign for primary election, and another $2,500 contribution from the same individual during the campaign for general election. Ohio Rev.Code § 3517.102(B)(1)(a-c).

tween judicial candidates by preventing all candidates, equally, from using contributions gained through forbidden judicial campaign speech. While not suggesting the plaintiffs in this case have done so, defendants add that a judicial candidate might even purposely amass a "war chest" during a campaign for non-judicial office (using tactics disallowed by the Judicial Code), all the while *planning* to use these funds for a later judicial campaign.

As an initial matter, the Judicial Code's prohibitions of a candidate's personal solicitation of campaign contributions, and expression of views on matters that may come before them, appear constitutional. *Stretton v. Disciplinary Bd. of Supreme Ct. of Pennsylvania,* 944 F.2d 137 (3rd Cir.1991). In *Stretton,* a judicial candidate "sought an injunction against enforcement of Canon 7 of the [Pennsylvania Code of Judicial Conduct], which bars candidates from announcing their views on disputed legal or political issues and also prohibits personal solicitation of campaign funds." *Id.* at 139. The court, however, denied the request for injunctive relief. First, the *Stretton* court noted that "a state has a compelling interest in the integrity of its judiciary." *Id.* at 142; *Morial v. Judiciary Comm'n of State of Louisiana,* 565 F.2d 295, 302 (5th Cir.1977) (en banc), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978) ("[t]he state's interest in ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party, or person is entitled to the greatest respect"). The court then found that the provision limiting the content of a judicial candidate's speech "serves that end," *Stretton,* 944 F.2d at 142, because "[t]he public has a right to expect that a court will make an assessment of the facts based on the evidence submitted in each case, and that the law will be applied regardless of the personal views of the judge. Taking a position in advance of litigation would inhibit the judge's ability to consider the matter impartially." *Id.* at 144.

The *Stretton* court also upheld the prohibition of personal solicitation of campaign funds, noting that "[t]he stake of the public in a judiciary that is both honest in fact and honest in appearance is profound.... A

judge's direct request for campaign contributions offers a *quid pro quo* or, at least, can be perceived by the public to do so. Insulating the judge from such direct solicitation eliminates the appearance (at least) of impropriety and, to that extent, preserves the judiciary's reputation for integrity." *Id.* at 145 (quoting *In re Fadeley,* 310 Or. 548, 802 P.2d 31, 40 (1990)).

As in *Stretton,* Canons 7(B)(2)(c-e) and 7(C)(2)(a) of the Ohio Judicial Code prohibit judicial candidates from personal solicitation of campaign funds and from announcing their views on disputed legal or political issues that may come before them. These Canons appear to be constitutional, and plaintiffs do not challenge them here. The provisions are designed to ensure the actual and apparent impartiality of the judiciary, and to avoid the actual or apparent quid pro quo corruption of judges.

 Canon 7(C)(8) is designed to serve these same compelling state interests. The Canon prevents a judicial candidate from using, in a judicial campaign, money that was likely raised through personal solicitation and/or in response to a candidate's views on disputed legal or political issues. Returning to the example mentioned above, Canon 7(C)(8) ensures a judicial candidate may not spend money campaigning for a judgeship if the money was raised through a personal solicitation letter advocating execution of drug felons or commutation of all death penalty sentences. This is entirely legitimate as a way to prohibit quid pro quo judicial rulings. Moreover, Canon 7(C)(8) serves to ensure all judicial candidates are protected equally: no judicial candidate, regardless of the nature of his prior campaigns for elected office, may use funds collected during a non-judicial campaign.

Not only does Canon 7(C)(8) serve a compelling state interest, it is narrowly tailored to further it. The Canon does not restrict a candidate for legislative or executive office from using funds raised in a previous legislative or executive, or even judicial, campaign. Nor does the Canon disallow a candidate for judicial office from using funds raised in a previous judicial campaign. Thus, despite Canon 7(C)(8), plaintiff Suster may: (1) use

the funds maintained by the "Friends of Ron Suster" committee to campaign for legislative or executive office; (2) use funds raised during his present judicial campaign for a subsequent judicial campaign; and (3) even use funds raised during his present judicial campaign for a subsequent legislative or executive campaign. Canon 7(C)(8) only disallows Suster from campaigning for judicial office with funds raised during a previous campaign for legislative or executive office. And, of course, Canon 7(C)(8) leaves available to Suster campaign fund sources other than the "Friends of Ron Suster" bank account.

In sum, the Court finds *Service Employees* and *Shrink Missouri* distinguishable, and further finds that plaintiffs are not likely to succeed on the merits of their argument that Canon 7(C)(8) is unconstitutional. The ban contained in that Canon, prohibiting intra-candidate transfers of campaign funds to judicial candidates, is narrowly tailored to serve the compelling state interest of ensuring that judges be and appear to be impartial, and the related interest of avoiding actual and apparent judicial corruption. Because Canon 7(C)(8) survives this exacting scrutiny, plaintiffs are not likely to succeed on the merits.

### 2. Other Factors.

As noted above in the context of discussing Canon 7(C)(6), "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976). To some extent, then, the second factor weighs in favor of plaintiffs, because their First Amendment rights are infringed by Canon 7(C)(8). This infringement, however, is no more than is necessary to further compelling state interests. The Court also notes that plaintiffs' injury is tempered somewhat in that the barriers limiting their opportunity to engage in unlimited political speech are greatly relieved by the Court's granting of the injunction relative to Canon 7(C)(6); Suster may spend more than $75,000 pursuing his campaign, but he must use funds other than those in the "Friends of Ron Suster" bank account.

Regarding the third factor, there does appear to be a substantial harm that would come to others if the injunction regarding Canon 7(C)(8) is granted. Judicial candidates who do not have access to a "war chest" compiled during campaigns for non-judicial offices would be at a severe disadvantage if those who do have such war chests, gained through tactics disallowed by the Judicial Code, could use them. Granting the requested injunction would allow some judicial candidates to enjoy benefits others cannot obtain. This factor weighs against granting the injunction; denying the injunction protects all judicial candidates equally.

Finally, the public interest factor weighs most heavily for defendants. As noted, "[t]he state's interest in ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party, or person is entitled to the greatest respect." *Morial,* 565 F.2d at 302. Canon 7(C)(8) helps to serve this interest, while limiting a judicial candidate's speech only so much as is necessary.

Weighing all four factors together, the Court concludes that the circumstances preponderate in favor of defendants, and a preliminary injunction enjoining enforcement of Canon 7(C)(8) is not appropriate in this case. Accordingly, the preliminary injunction is **DENIED,** as follows: (1) the Court declares that sentence one of Canon 7(C)(8) of the Ohio Code of Judicial Conduct is not unconstitutional; and (2) defendants may continue to enforce Canon 7(C)(8) of the Ohio Code of Judicial Conduct.

**IT IS SO ORDERED.**