892 F.Supp. 1246 (1995)
SHRINK MISSOURI GOVERNMENT PAC, et al., Plaintiffs,
v.
John MAUPIN, et al., Defendants.
No. 4:95CV815 CDP.
United States District Court, E.D. Missouri, Eastern Division.
July 7, 1995.
*1247 Frank Susman, Susman and Schermer, Douglas Bruce La Pierre, Washington University, St. Louis, MO, for plaintiffs.
James R. Layton, Atty. Gen. of Mo., Asst. Atty. Gen., Jefferson City, MO, for defendants.

MEMORANDUM AND ORDER
PERRY, District Judge.
This matter is before the Court on the parties' cross-motions for summary judgment. *1248 Plaintiffs' complaint seeks declaratory and injunctive relief enjoining defendants from enforcing certain portions of Missouri's recently effective campaign reform statutes, which plaintiffs contend violate the first amendment by impermissibly restricting political speech. The challenged provisions were contained in Senate Bill 650, which passed the state legislature in 1994 and became effective on January 1, 1995, and in Proposition A, which was passed by vote of the electorate on November 8, 1994, and which became effective that same day. Both Senate Bill 650 and Proposition A are "campaign reform" packages, in that they limit contributions, spending, and other actions that may be taken in political campaigns for Missouri elective offices.
The limits on campaign contributions contained in Proposition A have been upheld by the United States District Court for the Western District of Missouri, in Carver v. Nixon, 882 F.Supp. 901 (W.D.Mo.1995), and those contribution limits are not in issue in this suit. Instead, plaintiffs challenge the spending limits contained in Senate Bill 650, the Proposition A limits on amounts a candidate may carry over from one election to the next, the application of Proposition A's contribution limits to a candidate's own money, and a provision of Senate Bill 650 that requires certain campaign advertisements to state that they are approved and authorized by the candidate.
Plaintiff Shrink Missouri Government PAC is a Missouri political action committee. Plaintiff W. Bevis Schock is a Missouri citizen who ran, unsuccessfully, for the Republican nomination for United States Congress in the 1992 primary. Plaintiff Frederick T. Dyer previously served in both the Missouri House of Representatives and Missouri Senate, and was defeated in his bid for reelection to the Missouri Senate in 1994. Both individual plaintiffs state that they wish to run for office in the future, and the PAC plaintiff states that it wishes to continue to contribute to candidates for Missouri office in the future.
Defendants are John Maupin, sued in his official capacity as Chair of the Missouri Ethics Commission, and Jeremiah W. Nixon, sued in his official capacity as Missouri Attorney General. The Missouri Ethics Commission has certain statutory duties involved with enforcement of Missouri campaign laws, including collection of campaign financial reports and referral of campaign finance and reporting violations for criminal prosecution.
On May 10, 1995, the undersigned entered a Temporary Restraining Order enjoining defendants from enforcing the challenged statutes, and that TRO was later converted to a preliminary injunction. The parties jointly proposed that this case be resolved on cross-motions for summary judgment rather than through trial.

I. General Principles

In determining whether summary judgment should issue, the facts and inferences from these facts are viewed in the light most favorable to the non-moving party and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, however, the non-moving party may not rest on the allegations in its pleadings but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e). Although some factual evidence has been presented here, the issues presented are largely ones of law, and there are no genuine factual issues requiring resolution. Thus, decision on summary judgment is appropriate.
In their motion for summary judgment, plaintiffs argue that all the provisions violate the first amendment and must be enjoined. Defendants argue that the regulations *1249 are not content based,[1] and therefore need only a rational basis to be held constitutional, and, alternatively, that all the provisions withstand strict scrutiny in any event, so that none of them violate the first amendment.
In Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court established the framework for first amendment analysis of financial and disclosure limitations on political campaigns. Buckley upheld the contribution limits at issue in that case, while finding that limits on independent expenditures, restrictions on a candidate's own spending, and limits on overall campaign spending violated the first amendment. The Supreme Court in Buckley upheld other portions of the law before it, including a public financing scheme for presidential campaigns that was tied to voluntary spending limits. The application of Buckley and its progeny to the facts of this case determines whether Missouri's campaign reforms are constitutional. Under Buckley, content-based regulations are subject to strict scrutiny.
The test for whether a regulation is content neutral or content based is the "commonsense" determination of whether "the message conveyed determines whether the speech is subject to regulation." See Whitton v. City of Gladstone, 54 F.3d 1400 (8th Cir.1995), citing City of Cincinnati v. Discovery Network, Inc., ___ U.S. ___, ___-___, 113 S.Ct. 1505, 1506-17, 123 L.Ed.2d 99 (1993). Here, all the challenged regulations by definition apply only to political speech. The spending and contribution limits apply only to contributions or expenditures made for the purpose of advocating the election or defeat of a particular candidate. As the Eighth Circuit stated in Day v. Holahan, 34 F.3d 1356, 1361 (8th Cir.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995), "... expenditures of any other nature, supporting the expression of any sentiment other than advocating the defeat of one candidate or the election of another, do not trigger" the restrictions. The provisions apply only to political speech, and not to any other speech. They are, therefore, content based. Additionally, the provision requiring only literature which makes statements about another candidate to carry the "approved and authorized" wording (§ 130.031.12, R.S.Mo.) is explicitly content based. See also McIntyre v. Ohio Elections Commission, ___ U.S. ___, ___, 115 S.Ct. 1511, 1518, 131 L.Ed.2d 426 (1995).
In McIntyre, the Supreme Court stated: "When a law burdens core political speech, we apply `exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." ___ U.S. at ___, 115 S.Ct. at 1519, citing First Nat'l Bank v. Bellotti, 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978). Thus, this Court must apply "the most exacting scrutiny" to the statutes now before it. See also Turner Broadcasting System v. Federal Communications Commission, ___ U.S. ___, ___, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994).
Although defendants have argued a number of potential justifications for the laws at issue here, they have not provided any evidence that either the state legislature or the electorate actually considered those justifications in enacting Senate Bill 650 or Proposition A. Plaintiffs urge that "after-the-fact rationalizations" cannot be sufficient to withstand strict scrutiny, and that defendants must "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." United States v. National Treasury Employees Union, ___ U.S. ___, ___, 115 S.Ct. 1003, 1017, 130 L.Ed.2d 964 (1995), citing Turner Broadcasting System, ___ U.S. at ___, 114 S.Ct. at 2470.
Plaintiffs presented affidavits to the effect that they desire and need to violate the *1250 provisions to run effective campaigns or to effectively support the candidates of their choice. Defendants, on their initial motion for summary judgment, presented no evidence by way of affidavit or otherwise. Defendants' brief in opposition to plaintiffs' motion for summary judgment, however, attached certain exhibits. Defendants' exhibits do nothing to prove or disprove either defendants' or plaintiffs' case. There is no evidence provided that the legislature or the electorate actually considered or even had available the reports provided. None of the evidence presented gives rise to any genuine dispute of a material fact.
If plaintiffs are correct in their contention that the state must prove that the legislature and the electorate explicitly considered the specific wrongs now claimed to be remedied by the statutes, either by including "findings" in the laws themselves or by, for example, presenting evidence of legislative history or testimony about the intent of the electorate or of the legislature, then defendants clearly have not met that burden. The Court does not agree, however, that Supreme Court precedent requires that type of specific, historical factual proof. States such as Missouri, where the legislature does not collect or preserve legislative history, could never meet the burden plaintiffs urge. Thus, the undersigned will give the state the benefit of the doubt, and will assume, without finding, that in fact the justifications offered are the reasons for the passage of the laws.
The State asserts that four closely-related interests justify the statutory scheme at issue here: (1) preserving election integrity, (2) preventing corruption, (3) preventing false statements, and (4) promoting individual participation in the election process.
That states possess compelling interests in protecting the integrity of the electoral process and preventing corruption in the political process was recognized by Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Similarly, in First Nat'l Bank v. Bellotti, 435 U.S. 765, 788-89, 98 S.Ct. 1407, 1422, 55 L.Ed.2d 707 (1978), the Court recognized the state's interest in "preserving the integrity of the electoral process, preventing corruption, and sustaining the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government." Defendants argue that Missouri wishes to "encourag[e] and allow[] all citizens to participate in electoral politics", and that "the states do have an interest in protecting the free speech and election rights of all their citizens, to prevent their being trampled upon by the wealth that can be amassed by a few." As political or policy goals these statements cannot be seriously argued with. When the state's promotion of such goals interferes with political speech, however, these public policies must represent compelling needs, and the statutory scheme must be closely tailored to address those needs.

II. The Statutes at Issue

Plaintiffs' complaint alleges that four types of campaign restrictions violate their first amendment rights. The challenged provisions are[2]:
1. Provisions that limit the amount of money a candidate for public office may contribute to his or her own campaign. This restriction results from the interplay of the pre-existing definition of "contribution" contained in § 130.011(12)(a), and the limits on contributions contained in § 130.100 (Prop. A).
2. Section 130.130 (Prop. A), which requires that campaign funds in excess of expenditures made for any particular election must be returned to contributors or forfeited to the Missouri Ethics Commission.
3. Provisions that require a candidate to comply with spending limits or face one of two alternatives: not accept contributions from anyone other than individuals and file daily expenditure reports once expenditures exceed the limits (§ 130.052 of SB 650), or pay a "surcharge" to the Missouri Ethics *1251 Commission on amounts spent that exceed the limits (§ 130.053 of SB 650).
4. Subsection 12 of § 130.031 (SB 650), which requires certain types of campaign literature to contain a statement that the literature was "approved and authorized" by the candidate.

A. Candidates' Own Funds

The basic Proposition A limits on contributions contained in § 130.100 were recently upheld in Carver v. Nixon, 882 F.Supp. 901 (W.D.Mo.1995). The parties to that case did not argue that Proposition A limited the amounts that a candidate could contribute of his or her own money to a campaign. In other words, in that case the Western District court simply upheld the limitations on contributions that persons other than the candidate could give to the candidate. In doing so, Judge Clark stated
It is true that Proposition A does not limit the amount of personal funds a candidate may contribute to his or her own campaign and it does not limit contributors in their own personal direct expenditures made in promotion of a candidate. These types of limits are not at issue in this case. However, the Court notes that such limits on the candidate and on contributors would directly restrict the candidate's and contributors' own political speech and would run afoul of the protections of the First Amendment, while the limits on contributions at issue here only limit indirect speech of the contributor.
Carver, 882 F.Supp. at 906 (emphasis added). Defendants argue that this statement is a holding that the law does not limit the amount a candidate may spend of his or her own money. As Judge Clark stated, the issue was not before him, and it clearly is before the undersigned. Defendants neither consent to plaintiffs' requested injunction nor concede that Judge Clark's interpretation is correct, but simply state in their motion for summary judgment (for apparently the first time), that they would not argue the issue in this case. The issue has been properly presented in this case and is appropriate for determination on the cross-motions for summary judgment.
Section 130.011(12)(a), R.S.Mo., defines contribution to include "A candidate's own money or property used in support of his candidacy other than expense of his food, lodging, travel, and payment of any fee necessary to the filing for public office." This definition existed before Senate Bill 650 and Proposition A were passed, and nothing in Proposition A attempted to change or modify the pre-existing definition of contribution. The commonsense reading of the statute, therefore, provides that the Proposition A contribution limits upheld in Carver also apply to contributions or direct expenditures made by a candidate with his or her own money.
As Buckley held, and as Judge Clark recognized in Carver, such a restriction is clearly unconstitutional, as it limits a candidate's own direct personal speech, by limiting the amount of a person's own funds that he or she can spend in support of his or her own candidacy. There can be no compelling state justification for this direct limitation on a candidate's own political speech, and the defendants here have made no attempt to provide any justification. When the definition is applied to the contribution limits that have been previously upheld, it impermissibly interferes with a candidate's first amendment rights, and is unconstitutional. Therefore, plaintiffs are entitled to the injunction they seek preventing defendants from applying the definition in § 130.011(12)(a) to the contribution limits of § 130.100 of Proposition A.

B. Spending Limits

Senate Bill 650 established spending limits for campaigns for all state elected offices in Missouri. The limits vary depending on the office sought. The parties argue about whether these limits are voluntary or coercive. Under § 130.052.1, when a candidate files for office he or she must file an affidavit stating whether or not the candidate agrees to abide by the campaign spending limits established by the statute.[3] If a candidate *1252 files an affidavit refusing to comply with the limits, then that candidate may only accept contributions from individuals. The non-complying candidate may not accept contributions from PACs, parties, corporations, labor unions, or other candidates' committees, although a candidate who files an affidavit of intent to comply with the spending limits may accept such contributions. § 130.052.3. Additionally, a candidate who elects not to comply must, as soon as the spending limits are exceeded, file daily disclosure reports with the ethics commission. § 130.052.3. Any candidate who agrees to comply with the limits and then exceeds them must pay a "surcharge" to the ethics commission: the surcharge is a sliding percentage of the amount by which the limits were exceeded, ranging from twenty five percent of the overage to one hundred percent. See § 130.053.
Defendants here argue that these spending limits are voluntary ceilings and are therefore constitutionally permissible. Defendants argue that the statutory scheme merely provides incentives for complying with the campaign spending limits, while plaintiffs argue that the consequences of exceeding the limits or not agreeing to them are so Draconian that the limits are not voluntary.
Buckley v. Valeo upheld voluntary spending limits only where the reward for adhering to the limits was the receipt of public campaign financing. In Vote Choice, Inc. v. DiStefano, 4 F.3d 26 (1st Cir.1993), the First Circuit upheld a spending limits scheme that was found to be voluntary, but noted that "there is a point at which regulatory incentives stray beyond the pale, creating disparities so profound that they become impermissibly coercive." Id. 4 F.3d at 38. The Eighth Circuit recently found certain spending limits unconstitutional even where they were tied to a public financing scheme. Day v. Holahan, 34 F.3d 1356 (8th Cir.1994).
In finding the bulk of the spending limits before it in Buckley unconstitutional, the Supreme Court noted that: "It is clear that a primary effect of these expenditure limitations is to restrict the quantity of campaign speech by individuals, groups, and candidates." There is no doubt that the spending limits at issue here also clearly restrict the quantity of political speech. Like the limits overturned in Buckley, the limits here do not promote the State's interest in preventing quid pro quo corruption, because the limits apply only to expenditures made by a candidate or his committee. Persons wishing to exert corrupt influence over a candidate could still spend money on behalf of a candidate's party or in favor of issues closely identified with a candidate, without coming within the limits. Cf. Buckley, 424 U.S. at 45, 96 S.Ct. at 647.
The Missouri spending limits contained in Senate Bill 650, unlike those in the cases relied on by defendants, are not tied in any way to public campaign funding, and Missouri provides no matching or public funds to any candidates. Cf., Day v. Holahan, supra; Wilkinson v. Jones, 876 F.Supp. 916, 927 (W.D.Ky.1995) (Kentucky has compelling interest in encouraging candidates to accept public financing). Instead, the types of entities who can contribute to the candidates is limited if the spending limits are not followed, but unlimited if they are. The Court agrees with plaintiffs that the statutory scheme is coercive, because it withdraws an important source of private campaign funding otherwise available to candidates, but provides no method, such as public funding, of replacing that forfeited funding. Buckley's rationale for upholding spending limits in return for public financing was not based solely on the fact that the limits were voluntary: it was also based on the fact that encouraging use of public financing supported the goal of reducing corruption or the appearance of corruption, and that, of course, public financing of campaigns promotes, rather than restricts, political speech. Missouri's scheme has no such saving grace. The disparities created by the statutory scheme are so profound that they must be viewed as coercive. Similarly, the requirement to file daily reports once the spending limits are exceeded also provides only a penalty.
Defendants' briefs decry the large increase in campaign spending, and assert that the citizens and legislature recognized a legitimate interest in slowing or halting the increasing costs of political campaigns. Buckley specifically held that the mere growth in *1253 the cost of election campaigns in itself provides no basis for restrictions on the quantity of campaign spending. Id. at 57, 96 S.Ct. at 653. Defendants argue that times have changed since Buckley, because now the amounts spent on campaigns are even higher than anyone could have anticipated at the time of Buckley. This is a distinction without a difference, and defendants have failed to show that the increase in total dollars spent on campaigns somehow automatically increases corruption or decreases electoral integrity.
Defendants also argue that the state's interest in promoting individual participation in the electoral process is directly related to the total expenditures of an election, and that reducing the power of the wealthy to influence the electoral process is a legitimate goal. First, the contribution limits upheld in Carver appear to go a long way to promote this goal, and it is not at all clear that the spending limits add much, if anything, to this, except to the extent they apply to a candidate's own money. Buckley, of course, clearly prohibited any limits on a person's ability to spend his or her own money on his or her own campaign, and defendants have provided no rationale for why the world has changed since Buckley in this respect. Defendants' argument that the State has a compelling interest in "sustaining individual participation in the election process", as defendants' brief explains this interest, runs afoul of Buckley's holding that a government may not restrict the free speech rights of some elements of society in order to enhance the relative voices of others. The idea that "leveling the playing field" between the rich and the poor is a compelling justification for interference with core political speech has never been accepted by any court.
Defendants rely on the white primary and poll tax cases to construct an argument that, in today's political climate, the only way to protect the value of one person's individual vote is to limit total campaign spending. These cases, and their concern that the state not burden political speech, do not support defendants' arguments. The spending limits here do nothing to increase the power of a single voter. To the extent the state has any legitimate interest in equalizing the roles of all its voters, the contribution limits upheld in Carver promote that goal. The spending limits here clearly violate the rule of Buckley, and cannot withstand strict scrutiny.

C. The "Spend down" Provision

Proposition A provides, in § 130.130, that:
Within ninety days of the election to fill the office for which the candidate has filed or declared, said candidate and that candidate's campaign committee shall either
(a) Turn over to the state of Missouri for the benefit of the Missouri Ethics Commission, or
(b) Return to those persons reported as contributors to the candidate's campaign, any balance of campaign funds in excess of expenses incurred for the campaign, except for an amount no greater than ten times the individual contribution limit set forth above for that particular office.
Thus, Proposition A does not allow for carryover from one campaign to the next of any but very small amounts of campaign funds.[4]
Defendants argue that this provision does not restrict speech, but really encourages speech, by making candidates for public office use the funds they have raised for the purposes for which they were raised  the particular election and office of the current campaign. Defendants assert that this provision gives the candidate two choices: increase his or her political speech by spending all the raised funds, or give those funds back to the contributors, who can then re-give the money (and, therefore, speak again) during the next campaign.[5] Defendants assert that *1254 this provision protects the integrity of the election process because it forces candidates to use the funds for the purposes intended by the contributors (the particular election), rather than for amassing a war chest for future campaigns. Defendants further argue that the carryover restrictions prevent quid pro quo corruption through unchallenged incumbents' amassing large war chests, and that it levels the playing field between rich and poor and between challengers and incumbents.
The parties have cited only one case dealing with a provision in any way similar to that here. In Service Employees International Union v. Fair Political Practices Commission, 721 F.Supp. 1172 (E.D.Cal. 1989), aff'd 955 F.2d 1312 (9th Cir.1992), cert. denied ___ U.S. ___, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992), the California District Court found a somewhat similar "war chest" restriction unconstitutional. The California proposition provided that any campaign funds raised before January of 1989 could be used only for purposes other than to support or oppose a candidate for elective office. The court found that the provision had no effect on potential corruption in the political process and that the goal of levelling the playing field between rich and poor candidates was invalid, and concluded that the provision violated the first amendment. The undersigned must reluctantly agree that the Proposition A provision at issue here meets the same fate.
The "spend down" limits clearly limit political speech by telling a candidate when he or she must speak, that is, by stating that the money must be spent in the particular campaign in which it was raised. Defendants assume that contributors always wish to contribute to a candidate for a particular campaign, and that a general contribution to a candidate, which that candidate could use for current or future campaigns, must constitute an impermissible attempt at improper quid pro quo influence. The Court disagrees, and thinks that it is entirely legitimate for a contributor to give money to a candidate because the contributor supports that candidate, in whatever race the candidate may later choose to run. This type of "blind support" does not necessarily imply that the contributor expects favors, but rather that the contributor supports the candidate because of the candidate's particular views or politics  the very essence of protected political speech. The dangers of quid pro quo corruption are adequately addressed by the overall contribution limits that were upheld in Carver: the spend down limits do nothing to further the goal of preventing corruption.
It seems clear that the desire to limit the power of incumbency may be the real goal of the spend-down requirement, but the provision would only benefit incumbents who had not faced serious competition in past elections; it does nothing to limit the power of incumbents who face tough elections in each race and therefore presumably cannot amass large war chests. Thus, even if limiting the power of incumbency were a compelling interest (which Buckley appears to deny), this provision is not narrowly tailored to serve that interest. Additionally, as set forth above, to the extent the provision is justified because it "equalizes" the spending power of rich and poor, it runs afoul of Buckley's clear statement that that is not a compelling justification for interference with first amendment rights.

D. The "Approved and Authorized" Requirement

Senate Bill 650 added subsection 12 to § 130.031. That subsection provides that:
... any printed or broadcast matter ... which contains allegations regarding the actions, inactions, beliefs, behavior or other aspects of any candidate for office, other than the candidate or candidate committee which issued such printed or broadcast matter, shall contain ... a statement that ... the information contained in the advertisement has been approved by the candidate on whose behalf the printed or broadcast matter was issued. Such statement shall be in the following form: "The contents of this advertisement have been approved and authorized by ..." [the candidate on whose behalf the advertisement was issued].
A violation of this statute is a misdemeanor. See § 130.081. Even before the passage of SB 650, § 130.031 contained requirements that all print or broadcast matter relating to *1255 candidates or ballot issues contain a "paid for by" legend identifying the source of the matter. See § 130.031.8 and 9. Plaintiffs here are not challenging that "paid for by" requirement.[6]
In McIntyre v. Ohio Elections Commission, ___ U.S. ___, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), the Supreme Court held that an Ohio statute that prohibited the distribution of anonymous campaign literature violated the first amendment. The Court found that the State of Ohio could not justify its prohibition of anonymous handbills based on an interest in preventing fraud or libel or an interest in providing the electorate with relevant information. The Court noted that the Ohio statute would reach handbills that were not even arguably false or misleading and that if false or misleading advertisements were truly the target of the statute, it should have been more narrowly tailored to reach only those advertisements. Additionally, the Court found that the "simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." McIntyre, ___ U.S. at ___, 115 S.Ct. at 1520.
There can be no doubt that the Missouri provision requires a speaker to "make statements or disclosures she would otherwise omit." The defendants argue that the Missouri statute at issue here is narrowly tailored to achieve a compelling state interest in deterring false statements by candidates for public office and making those candidates accountable for materials put out by their campaigns. The undersigned agrees with defendants that the State may legitimately wish to protect the public from the evil hypothesized, specifically, that a candidate's campaign committee might make false statements about an opponent, which the candidate could then deny having approved. However, the Court finds that the State has failed to show either that this desire rises to the level of a compelling need or that this statute is narrowly tailored to meet that need. There has been absolutely no showing by the State that false advertising by campaign committees is a major electoral problem. The statute by its terms applies only to statements made by a candidate or a candidate's campaign committee. It does not apply to statements made by political action committees, industry lobbyists, "public interest" groups or others, anonymous or named, which are surely the source of most "deniable" negative campaigning. The State has provided no evidence of even a single instance where a campaign committee made a false statement which the candidate later disavowed. Nor has the state provided any evidence of an increase in false advertising or fraud in its political elections. It has simply decried "negative campaigning", in general, and while the Court might agree that negative campaigning is distasteful, that is not a sufficient basis for interfering with core first amendment rights.
Moreover, like the Ohio statute involved in McIntyre, and like the earlier California ordinance invalidated in Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), this statute "contains no language limiting its application to fraudulent, false, or libelous statements." McIntyre, ___ U.S. at ___, 115 S.Ct. at 1517. To the extent Missouri seeks to justify this regulation as a means of preventing fraud and false statements, it must fail for the same reason that the Ohio statute did. As in McIntyre, this provision applies "even when there is no hint of falsity or libel." Id.
Defendants argue that, unlike the Ohio statute in McIntyre, the Missouri statute applies only to elections of public officers, and not to ballot issues. Although Missouri's statute is admittedly narrower than Ohio's, the undersigned can find no constitutional significance in this distinction, as the provision still is not narrowly tailored to meet the need. The State also argues that McIntyre is distinguishable because the Missouri statute does not apply to anonymous advertisements at all, because Missouri candidates are already required to include a statement that the material was paid for by whatever campaign *1256 committee or candidate actually paid for the advertisement. It seems that to whatever extent the state wishes to impose accountability and lessen the opportunity for deniability, the "paid for by" requirement promotes that goal, without the need for the added "approved and authorized" language. Although Missouri, unlike Ohio, has no other specific prohibition on false statements made during political campaigns, Missouri common law recognizes the torts of defamation and fraud, and those doctrines are not abrogated merely because a political campaign is involved. In any event, if this statute is Missouri's "first line of defense" against fraud and false statements in political campaigns, it is unlikely to promote those goals. Thus, the Court must conclude under McIntyre that the burden imposed on political speech by the "approved and authorized" language does not withstand strict scrutiny. The statute violates the first amendment and the Court will enter the injunctive relief requested.

III. Conclusion

The patchwork of Missouri campaign reforms passed in 1994 indicates a strong desire by the legislature and the public to bring some limits to the increasingly costly and negative world of political campaigns. No one could seriously disagree, as a policy matter, that negative campaigning does not benefit the public discourse and that expenditures of unlimited amounts of money on political campaigns is not a sensible use of society's resources. That defendants, the state legislature, and a majority of the electorate may agree with those policy statements, however, does not entitle the state to interfere with the first amendment rights of persons such as plaintiffs. Buckley established very clear rules regarding what justifications may be sufficient for interference with core political speech, and the Missouri statutory scheme falls far short of meeting those tests. There are no genuine disputes of material fact remaining in this case, and plaintiffs are entitled to the permanent injunctive relief which they seek.
Accordingly,
IT IS HEREBY ORDERED that plaintiffs' motion for summary judgment [# 19] is GRANTED and defendants' motion for summary judgment [# 18] is DENIED.
A separate Judgment in accordance with this memorandum and order is entered this same date.

JUDGMENT
In accordance with the memorandum and order entered this same date,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that plaintiffs shall have summary judgment against defendants, and that defendants, their successors, agents and employees, are PERMANENTLY ENJOINED and RESTRAINED from the following:
1. Implementing, enforcing or acting in reliance upon § 130.130 of Proposition A and § 130.052, § 130.053, and § 130.031.12, R.S.Mo. (1995).
2. Applying the definition of "contribution" contained in § 130.011(12)(a), R.S.Mo., to the contribution limits contained in § 130.100 of Proposition A, that is, applying or enforcing the statute so that candidates for office would be limited in the amounts they may personally contribute to or spend on behalf of their own campaigns.
NOTES
[1] Actually, defendants state that they are not arguing this position because the Court stated, in its order granting preliminary relief, that the restrictions are content based. Defendants assert that absent that statement, they would be arguing that the restrictions are content neutral. The Court does not understand why a defendant would so readily abandon a position it purportedly deems correct when no final determinations have been made and no final relief has been granted, and therefore will consider that defendants, in fact, are still urging this position.
[2] For ease of reference, the Court uses the numbers assigned to these provisions for their inclusion in the Revised Statutes of Missouri, even though Proposition A has not actually been printed in that official code yet. Both Proposition A and Senate Bill 650 may be found in the unofficial annotated statutes, V.A.M.S., at Ch. 130.
[3] If that candidate's opponent later elects not to comply, the candidate may reconsider the declaration.
[4] Senate Bill 650 contained a similar provision, but the SB 650 version allows a longer time period for the return and allows the candidates or their committees to keep a significantly larger amount of excess funds. See § 130.038.
[5] Defendants assert that no candidate will ever turn the money over to the ethics commission, but instead will always give it back to contributors, who can then give it back in the next campaign. The statute does not provide any method for deciding which contributors receive refunds, and defendants' argument assumes that a candidate will select among the contributors to determine who should receive a refund, rather than attempting to refund the contributions in some pro-rata manner.
[6] Defendants argue that this failure indicates the invalidity of plaintiffs' challenge to the other provisions. The Court agrees that McIntyre calls into question the "paid for by" requirement, but that issue is not before the Court. Plaintiffs are not required to challenge all potentially unconstitutional provisions.