**The STATE of Texas, Appellant,**

v.

**John DOE (A Pseudonym), Appellee.**

**No. 05–99–01091–CR.**

Court of Appeals of Texas,
Dallas.

Oct. 16, 2001.

George R. Milner, Dallas, Eric V. Moye, Vial, Hamilton, Koch & Knox, L.L.P., Dallas, for Appellee.

Benjamin Laurence Stool, Asst. Dist. Atty., Dallas, for Appellant.

Before Justices LAGARDE, MORRIS, and O'NEILL.

## OPINION

MORRIS, Justice.

At issue in this case is the constitutionality of a statute regulating core political speech in the electoral process. The State indicted "John Doe" for violating section 255.001 of the Texas Election Code by circulating an anonymous flier opposing a particular candidate for public office. Doe challenged the indictment arguing the statute infringed upon his right to freedom of speech. We conclude section 255.001 on its face violates the First Amendment to the United States Constitution. Therefore, we affirm the trial court's judgment dismissing the charges against John Doe.

This dispute began with the creation and circulation of a political advertisement known as the "Pinocchio Flier." The flier was published anonymously. It described an incumbent candidate for the Dallas City Council as a "puppet who can't tell the truth." After the election, a complaint was filed with the Dallas County District Attorney's office pointing out that the flier did not contain the name and address of the person contracting for its publication. The absence of this information violated Texas

Election Code section 255.001 and constituted a Class A misdemeanor.

The Pinocchio Flier was distributed by a company called the Order Desk. An investigator for the district attorney's office contacted the president of the Order Desk to obtain records identifying the person who placed the distribution order. The Order Desk refused to comply with the request, and a subpoena duces tecum was issued. What followed was a lengthy battle waged in several courts over identification of the person responsible for the flier and a determination of the proper court to address the constitutional issues presented.[1] Ultimately, the creator of the Pinocchio Flier, John Doe, was indicted for violating section 255.001.[2]

In response to the indictment, Doe filed a motion to set it aside. Doe contended section 255.001 was unconstitutional because it sought to regulate core political speech and was not narrowly tailored to serve an overriding state interest. Because Doe believed section 255.001 was void, he argued the indictment failed to allege an offense. The State responded that it had a substantial interest in notifying the public of the source of campaign literature and in preventing actual or perceived corruption in the political process. According to the State, section 255.001 directly served these interests and was, therefore, constitutional. The trial court ruled in favor of Doe, holding that section 255.001 violated the First Amendment to the United States Constitution.[3] The trial

---

1. The procedural history of this dispute is more fully set forth in this Court's opinion *Dallas County District Attorney v. Doe*, 969 S.W.2d 537 (Tex.App.—Dallas 1998, no pet.).

2. The parties on appeal use the defendant's pseudonym, John Doe.

3. The trial court held, without limitation, that section 255.001 is unconstitutional. Such a ruling is appropriate only in a case where the issue is whether the statute is facially unconstitutional. In contrast, under an "unconstitutional as applied" challenge, the moving party generally concedes the constitutionality of the statute, but argues that it is being

court set aside the indictment, and the State brought this appeal. The appeal focuses on the conflict between the State's interest in policing its elections and an individual's right to engage in anonymous political speech.

## II.

To assist in the regulation of campaign contributions and expenditures, the Texas Legislature adopted laws requiring disclosures to be made in political advertisements. Under section 255.001 of the Texas Election Code, any person who enters into a contract or other agreement for the printing, publication, or broadcasting of a political advertisement must identify himself or the person he represents within the advertisement.[4] TEX. ELEC.CODE ANN. § 255.001 (Vernon Supp.2001). Political advertising includes any communication supporting or opposing a candidate for public office or office of a political party. *Id.* § 251.001(16). Political advertising also includes communications supporting or opposing a political party, a public officer, or a measure. *Id.* The disclosure requirement applies to all political advertisements published in the print media, broadcast by radio or television, or appearing in a pamphlet, circular, flier, or other similar form of written communication. *Id.*

◼ The contracting parties in this case were Doe and the Order Desk. Doe entered into an agreement with the Order Desk for the distribution of his anonymous Pinocchio Flier through a bulk mailing. It was through this bulk mailing that Doe's flier was disseminated to the public. Accordingly, the agreement between Doe and the Order Desk was one to publish a political advertisement. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1837 (1993) ("publish" is to declare publicly or make generally known, disclose, or circulate); THE AMERICAN HERITAGE DICTIONARY 1057 (1st ed.1969) ("publish" is to prepare and issue printed material for public distribution). The State claimed Doe violated section 255.001 by failing to identify himself on the flier.

◼ Although the language of section 255.001 speaks in terms of "contracts or other agreements," the substance of the statute regulates the content of political advertising and, therefore, the content of core political speech. *See McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 346–47, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (speech designed to influence voters in an election is core political speech). It is the content of the statement being published that determines whether the statute applies. Furthermore, when the statute applies, it is the content of the statement

---

unconstitutionally applied to his particular circumstances. *See Tex. Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454, 461 n. 5 (Tex.1997). Doe's motion asked that section 255.001 be held unconstitutional in its entirety. Furthermore, Doe's motion did not focus on the facts of his case, but rather addressed why the statute, by its terms, operated unconstitutionally. Doe's challenge, therefore, was to the facial constitutionality of section 255.001. *See id.*

4. Section 255.001 states:
 (a) A person may not knowingly enter into a contract or other agreement to print, publish, or broadcast political advertising that does not indicate in the advertising:
 (1) that it is political advertising;
 (2) the full name of either the individual who personally entered into the contract or agreement with the printer, publisher or broadcaster or the person that individual represents; and
 (3) in the case of advertising that is printed or published, the address of either the individual who personally entered into the agreement with the printer or publisher or the person that individual represents.

that must be augmented with a name and address.

Freedom of speech includes the right to engage in the dissemination of ideas without being publicly identified. *See Talley v. Cal.*, 362 U.S. 60, 65, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960). To comply with section 255.001, however, an author must add personal information to the text of his statement. A law mandating that additions be made to a statement curtails the author's freedom to omit any information he chooses. The United States Supreme Court has stated "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre*, 514 U.S. at 342, 115 S.Ct. 1511.

The requirements of section 255.001 arguably may be avoided by a person publishing a political advertisement alone, without the involvement of another, like the Order Desk. A person's decision to do so, however, severely limits his or her opportunity to engage meaningfully in the anonymous dissemination of political ideas to any significant portion of the electorate. Moreover, should a person choose to distribute his political advertisement personally to avoid the proscription of section 255.001, he will likely disclose his connection to the advertisement in the process. At best, the statute prevents all but the most resourceful individuals from engaging in the publication of political advertising without revealing their identity.

Limiting anonymity to individuals acting alone also may prevent groups who espouse unpopular viewpoints from publishing their message. As the United States Supreme Court has noted, "[p]ersecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." *Talley*, 362 U.S. at 64, 80 S.Ct. 536. Anonymity allows individuals to discuss matters of public importance without fear of reprisal. *Id.* at 65, 80 S.Ct. 536; *see also Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 198–99, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (requiring petition circulators to wear identifying badges forces them to reveal their identity at the same time they deliver their political message thus exposing them to "heat of the moment" harassment). Regardless of the motivation for remaining anonymous, the ability of an author or other sponsoring party to withhold his identity while engaging in political speech is a right that may be burdened only in the face of the most compelling state interests. *See McIntyre*, 514 U.S. at 341–42, 115 S.Ct. 1511. As a burden on core political speech, section 255.001 is subject to "exacting scrutiny" and can be upheld only if it is "narrowly tailored to serve an overriding state interest." *See id.* at 347, 115 S.Ct. 1511.

In this case, the State identifies three interests to justify the requirements imposed by section 255.001:(1) deterring and punishing political corruption; (2) notifying the public of any allegiance a particular candidate might feel toward the publisher of the communication; and (3) providing a method of detecting those expenditures which appear to be from individuals, but in reality come from political action committees or corporations. These interests all concern the regulation of elections and election campaigns. It has been consistently recognized that there must be substantial regulation of elections if they are to be fair, honest, and orderly. *See, e.g., Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997); *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Specifically, the gov-

ernment's interest in preventing and detecting corruption in campaign finances may be of sufficient importance to outweigh possible infringement on constitutional rights. *See Buckley v. Valeo,* 424 U.S. 1, 66–67, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The State's interests in this case, therefore, are compelling. But this is only half the analysis. We must also determine whether section 255.001 is drafted in a sufficiently narrow fashion so as to burden the right to freedom of speech as little as necessary to achieve the State's goals.

A similar statute to the one at issue was analyzed by the United States Supreme Court in *McIntyre v. Ohio Elections Commission.* In *McIntyre,* the Supreme Court addressed an Ohio law mandating that any published statement designed to influence voters in an election with respect to a candidate or issue must contain the name and address of the person or organization responsible for its issuance. *McIntyre,* 514 U.S. at 357, 115 S.Ct. 1511. Ohio sought to justify the statute by arguing it provided the electorate with relevant information and prevented the dissemination of fraudulent and libelous statements. *Id.* at 348, 115 S.Ct. 1511. In concluding the statute was unconstitutional, the Supreme Court held that providing voters with additional relevant information did not justify a state requirement that a writer make statements or disclosures he would otherwise omit. *Id.* The court stated that readers could evaluate the anonymity along with the message "as long as they [were] permitted, as they must be, to read that message." *Id.* at 348 n. 11, 115 S.Ct. 1511. The court further held that Ohio's prohibition against anonymous political statements was not its principal weapon against fraud, but merely a deterrent and aid to

enforcement. *Id.* at 350–51, 115 S.Ct. 1511. The ancillary benefits to the State did not justify the broad reach of the statute. *Id.* at 350, 115 S.Ct. 1511.

 We conclude the Supreme Court's analysis in *McIntyre* applies with equal force to section 255.001.[5] Although the State contends section 255.001 serves its compelling interest to deter and punish political corruption, it does not specify what types of political corruption section 255.001 was intended to address. Nothing in the section limits its application to wrongful actions such as the publication of statements that are false, misleading, fraudulent, or libelous. All political advertisements, regardless of their accuracy or veracity, are potentially subject to the section's prohibition on anonymity. Texas law already deters false and fraudulent statements through recognized tort claims. Section 255.001 is nothing more than a deterrent and an aid to enforcement of these laws. As such, it does not justify a sweeping prohibition on anonymous political speech. *See id.* at 350–51, 115 S.Ct. 1511; *see also Shrink Mo. Gov't PAC v. Maupin,* 892 F.Supp. 1246, 1256 (E.D.Mo.), *aff'd,* 71 F.3d 1422 (8th Cir. 1995).

Moreover, to the extent section 255.001 is directed at abuse or corruption in campaign financing, the State's interests in that area are addressed by the Texas Election Code's numerous restrictions on contributions and expenditures together with its extensive campaign finance reporting requirements. *See* TEX. ELEC.CODE ANN. chs. 253–54 (Vernon Supp.2001). Under these statutes, candidates, office holders, and political committees must report the full name and address of any person making contributions that, in the aggregate,

---

**5.** Indeed, in a dissent to *McIntyre,* Justice Scalia, joined by the chief justice, noted that the majority opinion affected similar laws in twenty-four other states including Texas Election Code section 255.001.

exceed fifty dollars in value. *Id.* § 254.031. Political expenditures that exceed fifty dollars must also be similarly reported. *Id.* A "contribution" includes any direct or indirect transfer of money, goods, services, or any other thing of value. *Id.* § 251.001(2). A "campaign expenditure" means an expenditure made by any person in connection with a campaign for an elective office or a measure. *Id.* § 251.001(7). Campaign finance laws, therefore, already require accountability to inhibit campaign finance abuse or corruption.

Although the identification of parties responsible for a political advertisement within the advertisement itself may help ensure that contributions and expenditures are accurately reported, this ancillary enforcement benefit, once again, cannot justify section 255.001's sweeping infringement on protected anonymous speech. The efficacy of the identification requirement alone to detect campaign finance abuses is questionable. Any person who wishes to evade the reporting requirements could simply use a fictitious name and address. The identification requirement itself, therefore, affects only citizens who reveal their true identities. And to the extent the State has a compelling interest in ensuring political advertising is attributed accurately to its originating source rather than a false source, the Texas Election Code provides that it is an offense to agree to publish a political advertisement that "purports to emanate from a source other than its true source." *Id.* § 255.004. The election code further prohibits contributions or expenditures in another's name unless the person discloses in writing to the recipient or beneficiary the name and address of the person actually making the contribution or expenditure. *Id.* § 253.001.

The second compelling interest urged by the State is notifying the public of a candidate's possible allegiances. We recognize that voters may be concerned about a candidate's sources of support. To the extent a candidate acknowledges and accepts support, however, this information is readily available through the political finance reports referred to above. The reports are preserved for two years and are open to public inspection. *See id.* § 254.040–0401. The reports directly inform the public of a candidate's possible allegiances while employing a disclosure requirement less burdensome on individual rights. *See Buckley*, 424 U.S. at 66–68, 96 S.Ct. 612; *see also McIntyre*, 514 U.S. at 355, 115 S.Ct. 1511.

Finally, the State argues that section 255.001 provides a method of detecting expenditures that appear to be made by individuals when, in fact, they are made by political committees or corporations. But political committees are required to report their expenditures. *See* TEX. ELEC.CODE ANN. §§ 254.121–163. And corporations are prohibited from making contributions to, or expenditures on behalf of, a specific candidate. *Id.* §§ 253.091–104. Thus, the identification requirement is not the principal weapon against misleading activities; the statutory reporting requirements and prohibitions on expenditures are. The identification requirement, once again, is simply an aid to enforcement of other statutes.

If the State's interest is in informing the public about the source of a political advertisement at the time the message is being conveyed, this is merely an attempt to provide the message's audience with additional relevant information that the author has chosen to omit. Although the identity of the author is helpful in evaluating the message, the "best test of the truth" is the

power of the thought itself. *McIntyre*, 514 U.S. at 348 n. 11, 115 S.Ct. 1511.

■ Based on the foregoing, we conclude section 255.001 is not narrowly tailored to serve an overriding State interest. In fact, the statute's broad proscription on anonymous political speech reaches well beyond the conduct targeted by the State. To the extent section 255.001 has an impact on the targeted conduct, it is only as a deterrent and aid to enforcement of other statutes. A state cannot significantly infringe upon an individual's freedom of speech simply to obtain the ancillary benefit of detecting violations of other laws. Therefore, we hold that section 255.001 is unconstitutional on its face and cannot be upheld.

In an attempt to prevent the statute from being struck in its entirety, the State urges us to give it a narrowing construction or to sever any offending portions of the statute to the extent necessary to save it. In making this request, the State assumes that section 255.001 would pass constitutional muster if it were crafted to allow individuals to contract for the publication of anonymous political advertising about a ballot issue or measure. The State's argument is based on a limited reading of the holding in *McIntyre*.

■ The Supreme Court noted in *McIntyre* that a state's interest in combating political corruption is greater in candidate elections than in votes on public issues. *Id.* at 352 n. 15, 115 S.Ct. 1511. The court did not hold, however, that this greater interest would be sufficient to justify a disclosure requirement directed only at political advertisements expressly supporting or opposing a candidate. *See Maupin*, 892 F.Supp. at 1255. *But see Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 386 (2d Cir.2000); *Ky. Right to*

*Life, Inc. v. Terry*, 108 F.3d 637, 647 (6th Cir.1997). The court declared the entire Ohio statute at issue unconstitutional, including the portions that required identifying disclosures to be made on candidate centered publications. The court's analysis is equally applicable to all political speech, regardless of its focus. Indeed, while the state's interests may be heightened in a candidate election, so are a speaker's. The constitutional guarantee of free speech "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *McIntyre*, 514 U.S. at 347, 115 S.Ct. 1511. The need to promote full and fair discussion is critical to the election of public officials where, as contrasted with votes on public measures, all the pertinent information may not be freely available.

No construction or reconstruction of section 255.001 could bring it within the scope of constitutional validity. The section is unconstitutional in its entirety under the First Amendment to the United States Constitution.

We affirm the trial court's judgment dismissing the indictment against John Doe.

LAGARDE, Justice, dissenting.

The sole issue in this case is whether section 255.001 of the Texas Election Code ("the Texas statute") is unconstitutional for violating John Doe's right to free speech under the First Amendment to the United States Constitution. U.S. CONST. amend. I. While conceding the State's interests in this case are compelling, the majority concludes the Texas statute is "not narrowly tailored to serve an overriding State interest" and ultimately holds that "section 255.001 is unconstitutional on its face and cannot be upheld."[1] Because I disagree, I must respectfully dissent.

---

1. The trial court's order setting aside the indictment does not find the statute *facially*

In relevant part, the First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The First Amendment applies to the states through the Fourteenth Amendment. U.S. Const. amend. XIV, § 1; *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 n. 1, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).

The Texas statute regulating political advertising provides:

(a) A person may not knowingly enter into a contract or other agreement to print, publish, or broadcast political advertising that does not indicate in the advertising:

 (1) that it is political advertising;

 (2) the full name of either the individual who personally entered into the contract or agreement with the printer, publisher, or broadcaster or the person that individual represents; and

 (3) in the case of advertising that is printed or published, the address of either the individual who personally entered into the agreement with the printer or publisher or the person that individual represents.

Tex. Elec.Code Ann. § 255.001(a) (Vernon Supp.2001).

Initially, it is important, I think, to point out that this case involves the following: (a) a candidate election; (b) a commercial business transaction; (c) political advertising *not authorized, and specifically disapproved,* by the candidate; (d) an agreement between the candidate's political consultant (independent of the campaign) and a corporation, The Order Desk, Inc.;[2] (e) distribution via bulk mail; and (f) a losing candidate. This case also involves the State's interest in combating political corruption, which, as the United States Supreme Court noted in *McIntyre*, is greater in candidate elections than in votes on public issues. *McIntyre*, 514 U.S. at 352 & n. 15, 115 S.Ct. 1511.

The Texas statute is presumptively constitutional. *See Ex parte Granviel*, 561 S.W.2d 503, 511 (Tex.Crim.App.1978). Moreover, the Fifth Circuit Court of Appeals has reviewed the Texas statute against a First Amendment free speech challenge, and the court expressly held it to be constitutional. *KVUE Inc. v. Moore*, 709 F.2d 922, 937 (5th Cir.1983), *aff'd sub nom., Tex. v. KVUE-TV, Inc.*, 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984). The *KVUE-TV* court stated that the "Texas sponsorship requirements are 'generally-applicable and evenhanded regulations that protect the integrity and reliability of the electoral process itself.' " *Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 & n. 9, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)). The court went on to recog-

---

unconstitutional, but states, in relevant part, "This Court, after considering the evidence, authority and argument of counsel is of the opinion that TEX. ELEC. CODE § 255.001 is violative of the First Amendment to the United States Constitution and is therefore unconstitutional. Under the circumstances, the Motion is well taken." A review of the Motion to Set Aside the Indictment, likewise, does not reveal a request to declare the statute facially unconstitutional. The purpose of the motion was specifically to set aside Doe's indictment. Although the trial court's order does find the Texas statute unconstitutional, it does not find

it facially unconstitutional. Further, the sole issue raised by the State in its appeal is that the statute is *constitutional as applied* to John Doe. Nothwithstanding the language of the trial court's order and the State's issue on appeal, the majority goes further and holds the statute *facially unconstitutional.*

**2.** *See Dallas County Dist. Attorney v. Doe*, 969 S.W.2d 537, 539 (Tex.App.—Dallas 1998, no pet.) (Doe hired The Order Desk, Inc. to distribute the flier via bulk mail).

nize that the Texas sponsorship requirements do not regulate the content of the political message, but even if they do infringe on First Amendment rights, the infringement is of an extremely limited nature. *Id.* After applying the balancing test of *Anderson,* the Fifth Circuit held that the Texas statute does not violate the free speech clause of the First Amendment.

In 1995, the United States Supreme Court issued its opinion in *McIntyre,* holding an Ohio statute unconstitutional on First Amendment free speech grounds because it prohibited the distribution of anonymous campaign literature. 514 U.S. at 356, 115 S.Ct. 1511.[3] Based on *McIntyre,* Doe has challenged the Texas statute, and the majority has held it facially unconstitutional.

The question before us in this case is whether the holding in *McIntyre* invalidates the Texas statute as applied to Doe on First Amendment free speech grounds. I conclude that it does not. It is my view that the Texas statute differs in material ways from the Ohio statute that was declared unconstitutional in *McIntyre* and, thus, is not controlled by the *McIntyre* holding. It is my view that the Texas statute does not directly regulate an individual's independent free speech but, rather, regulates only the electoral process by regulating the commercial activity of entering into a contract or agreement with another to print, publish, or broadcast political advertising. Or put another way, it regulates interdependent, not independent, activity. By so doing, in my view, the Texas statute comes within the United States Supreme Court's holding in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), and, therefore, is a constitutional regulation of the electoral process. In *Buckley,* the Supreme Court upheld certain provisions of the Federal Election Campaign Act that required private individuals to report certain expenditures in a candidate election. *See McIntyre,* 514 U.S. at 384, 115 S.Ct. 1511 (Scalia, J. dissenting) (citing *Buckley v. Valeo,* 424 U.S. 1, 80, 96, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam)). I agree with Justice Scalia who said: "If *Buckley* remains the law, this is an easy case." *Id.* at 385, 115 S.Ct. 1511.

The State identifies three interests to justify the requirements imposed by the Texas statute: (1) deterring and punishing fraud; (2) notifying the public of any allegiance a particular candidate might feel toward the publisher of the communication; and (3) providing a method of detecting those expenditures which appear to be from individuals, but in reality come from political action committees or corporations. The Texas statute applies only to situations where there is a contract or agreement with another to print, publish, or broadcast a political advertisement. As such, the statute seeks to regulate the commercial transaction and, therefore, the electoral process, not the political speech. Here, for instance, the "publisher" (*i.e.,* distributor) is a corporation, The Order Desk, Inc. *Dallas County Dist. Attorney v. Doe,* 969 S.W.2d 537, 539 (Tex.App.— Dallas 1998, no pet.). As the majority recognizes, the law forbids corporate expenditures or contributions on behalf of a specific candidate. Tex. Elec.Code Ann. §§ 253.091–.104 (Vernon Supp.2001). To permit anonymous agreements diminishes accountability within the electoral process and increases the likelihood of unauthorized contributions and expenditures by corporations. Application of the mandato-

---

**3.** The Ohio statute expressly prohibited distribution of certain materials. The Texas statute does not; however, the majority, by construction, includes distribution within the meaning of the term "publish" which the Texas statute expressly prohibits.

ry provisions in this case requiring disclosure of the identity of the individual who contracted or agreed with The Order Desk, Inc., a corporation, regulates the electoral process and corporate participation in that process. It protects a corporation from an appearance that it is making an illegal contribution when in fact it is not. Without the statutory mandatory disclosures, an appearance of corruption could exist because there is nothing to indicate that it is not the corporation illegally distributing the fliers. Furthermore, the mandatory disclosure requirements serve the State's interest in detecting illegal expenditures without a needless waste of resources that might otherwise be required to police what, on its face, might appear to be an unauthorized corporate expenditure but in fact is not. Consequently, it serves the State's greater interest in combating political corruption in candidate elections recognized in *McIntyre*. 514 U.S. at 352 & n. 15, 354 n. 18, 115 S.Ct. 1511. These inappropriate actions are exactly what the State hopes to avoid through its extremely limited regulation of the electoral process. By imposing the identification requirement only on interdependent activity, not on independent activity, and by permitting identification of the contracting individual without requiring disclosure of the identity of the speaker or author, the narrowly tailored Texas statute is justified by the State's enforcement interest in maintaining the integrity of the electoral process.

Unlike the "extremely broad" Ohio statute at issue in *McIntyre*, the Texas statute is much more narrowly tailored. *See McIntyre*, 514 U.S. at 338 n. 3, 115 S.Ct. 1511 (setting out text of OHIO REV.CODE ANN. § 3599.09(A) (1988)). The Ohio statute clearly regulated independent activity; the Texas statute clearly does not. Unlike the Ohio statute that required disclosure of the *identity* of the *speaker or author*, the Texas statute requires only disclosure of the name and address of *either* the individual who personally enters into a contract or agreement or the person that individual represents.[4] Contrary to the majority's assertions, compliance with the Texas statute does not require disclosure of the identity of the *speaker or author*. I conclude, therefore, it is a regulation of the electoral process and more appropriately falls within *Buckley*.

In the alternative, and to the extent the Texas statute infringes on Doe's free speech rights, any infringement is "of an extremely limited nature." *KVUE*, 709 F.2d at 937. "Appropriately leaving open matters not presented by McIntyre's handbills, the [*McIntyre*] Court recognize[d] that a State's interest in protecting an election process 'might justify a more limited identification requirement.'" *McIntyre*, 514 U.S. at 358, 115 S.Ct. 1511 (Ginsburg, J., concurring) (quoting the majority). Justice Ginsburg also clarified the *McIntyre* holding: "We do not hereby hold that the State may not in other, larger circumstances require the speaker to disclose its interest by disclosing its identity." *Id.* I conclude the Texas statute is sufficiently narrow to bring it within the "more limited identification requirement" recognized by the *McIntyre* majority and Justice Ginsburg in concurrence. I also conclude it involves the "larger circumstances" referred to by Justice Ginsburg. *See id.*

Doe overemphasizes the importance of Justice Scalia's reference to the Texas statute in his dissent in *McIntyre*. Justice

---

4. The statute also requires that the political advertising include the statement that it is political advertising, but Doe makes no complaint about that requirement, challenging only the statute's mandatory disclosure provision.

Scalia, joined by Chief Justice Rhenquist, dissented. In a "parade of horribles" in footnote two of Justice Scalia's dissent, he referenced statutes from forty-nine states, the District of Columbia, and a federal statute as being potentially invalidated by the majority's holding. *See id.* at 376 n. 2, 115 S.Ct. 1511 (Scalia, J., dissenting). Doe seized upon that reference in his challenge to the Texas statute. It goes without saying, however, that Justice Scalia's dissent has no precedential value. Moreover, it is initially the job of the Texas courts to determine the constitutionality and continued validity of the Texas statute post-*McIntyre.* Justice Scalia recognized this in the text of his dissent. He noted that the *McIntyre* majority failed to establish a "clear rule of law," and that failure left uncertain the decision's effect on many similar state statutes. *Id.* at 380, 115 S.Ct. 1511 (Scalia, J., dissenting). Although the *McIntyre* majority held that the Ohio statute burdened core political speech and could not withstand exacting scrutiny, they left open the possibility that "a State's enforcement interest might justify a more limited identification requirement." *Id.* at 353, 115 S.Ct. 1511. Justice Scalia opined that the majority's view—that a state might "in larger circumstances" be justified in requiring a speaker to disclose his or her identity—leaves open the possibility that many of the statutes implicated by *McIntyre* remain constitutional because they involve such "larger circumstances." *Id.* at 380–81, 115 S.Ct. 1511 (Scalia, J., dissenting). Although I disagree with Justice Scalia that the Texas statute requires disclosure of the identity of the *speaker,* I do conclude the narrowly tailored Texas statute, as a "more limited identification requirement" involving "larger circumstances," remains constitutional in the wake of *McIntyre.*

Furthermore, it is my view that the Texas statute is also narrowly tailored to serve an overriding state interest because it regulates interdependent, not independent, activity, and as applied to Doe, commercial activity as well. Although it may implicate free speech, the Texas statute does not prohibit anonymous free speech. Compliance with the statute does not require disclosure of the identity of the speaker or author. For example, one could anonymously prepare a piece of political advertising, have an agent take it to a printer, publisher, or broadcaster, and fully comply with the statute by identifying the agent as the individual personally entering into the contract or agreement without disclosing the identity of the author. The individual personally entering into the contract or agreement could be anyone—perhaps someone whose business it is to enter into such contracts or agreements on behalf of people who wish to be anonymous. This is a significant and material difference between the Texas and Ohio statutes.

Unlike the statutes at issue in *McIntyre, Talley,* and *Maupin,* the Texas statute does not bar all anonymous political advertising. *See McIntyre,* 514 U.S. at 338 n. 3, 115 S.Ct. 1511 (Ohio statute required all political advertisements to bear the name and address of the person responsible for them); *see also Talley v. Cal.,* 362 U.S. 60, 61, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (city ordinance required all handbills to disclose the author or distributor's name and address); *Shrink Mo. Gov't PAC v. Maupin,* 892 F.Supp. 1246, 1254 (E.D.Mo.1995), *aff'd,* 71 F.3d 1422 (8th Cir.1995), *cert. denied sub nom., Nixon v. Shrink Mo. Gov't PAC,* 518 U.S. 1033, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996) (statute required any printed or broadcast matter containing allegations regarding a candidate for office to contain a statement that the information was approved by the candidate on whose behalf the advertisement was issued).

Each of these statutes was found to be unconstitutional, in part, because they barred *all* anonymous political advertising. *McIntyre*, 514 U.S. at 351–53, 115 S.Ct. 1511; *Talley*, 362 U.S. at 63–64, 80 S.Ct. 536; *Maupin*, 892 F.Supp. at 1255–56. That is not the case here. Under the Texas statute, an individual may print, publish, or broadcast anonymous fliers, such as the "Pinnochio Flier," as long as that individual does not contract or otherwise agree with another to print, publish, or broadcast that flier.

Further, in stark contrast to the Ohio statute, the Texas statute *on its face* does not apply to the type of independent personal activity engaged in by McIntyre and protected by the United States Supreme Court. As the *McIntyre* majority pointed out, McIntyre's independent conduct of distributing the leaflets essentially by herself "is the essence of First Amendment expression" and cannot be inhibited. *McIntyre*, 514 U.S. at 347, 351, 115 S.Ct. 1511. To violate the Texas statute, an individual must involve another in the activity of printing, publishing or broadcasting. Here, that "another" is a corporation and the activity is commercial. McIntyre's independent activity of distributing the leaflets would not constitute a violation of the Texas statute. *Cf. Doe v. Mortham*, 708 So.2d 929, 930 n. 3, 934 (Fla. 1998) (upholding the constitutionality of a statute that required the words "paid political advertisement" and the identity of the advertisement sponsor to be on all political advertisements and campaign literature, by reading the statute as not applying to independent conduct such as McIntyre's). However, because the Texas statute is unambiguous and on its face does not apply to independent conduct of the kind engaged in by McIntyre, to uphold it as constitutional requires no narrowing construction to distinguish it from the independent conduct in *McIntyre*.

The Supreme Court's holding in *McIntyre* declaring a remarkably broader Ohio statute unconstitutional does not inevitably invalidate the Texas statute.

Without a disclosure requirement, it will be impossible for a state to punish corporate acts of illegal expenditures or contributions because an anonymous speaker/author can hide faceless behind an anonymous individual who contracts or agrees with the corporate printer, publisher, or broadcaster to distribute his message. By narrowly tailoring the Texas statute to situations involving a contract or agreement, the State has focused on the most likely abusers of the electoral process insofar as unauthorized corporate expenditures and contributions are concerned.

In his dissent in *McIntyre*, Justice Scalia eloquently set out wherein the usefulness of mandatory disclosure requirements lies:

> It lies also in promoting a civil and dignified level of campaign debate—which the State has no power to command, but ample power to encourage by such undemanding measures as a signature requirement. Observers of the past few national elections have expressed concern about the increase of character assassination—"mudslinging" is the colloquial term—engaged in by political candidates and their supporters to the detriment of the democratic process. Not all of this, in fact not much of it, consists of actionable untruth; most is innuendo, or demeaning characterization, or mere disclosure of items of personal life that have no bearing upon suitability for office. Imagine how much all of this would increase if it could be done anonymously. The principal impediment against it is the reluctance

of most individuals and organizations to be publicly associated with uncharitable and uncivil expression. Consider, moreover, the increased potential for "dirty tricks." It is not unheard of for campaign operatives to circulate materials over the name of their opponents or their opponents' supporters (a violation of election laws) in order to attract or alienate certain interest groups. How much easier—and sanction free!—it would be to circulate anonymous material (for example, a *really* tasteless, though not actionably false, attack upon one's own candidate) with the hope and expectation that it will be attributed to, and held against, the other side.

514 U.S. at 382–3, 115 S.Ct. 1511 (Scalia, J., dissenting).

I believe those reasons are even more compelling under the facts of this case involving mass distribution by a corporation. Because I conclude this statute is distinguishable from the statute at issue in *McIntyre* and is narrowly tailored to serve the State's overriding interests, thus coming within the "larger circumstances" contemplated in *McIntyre*, I further conclude the statute is constitutional as applied to Doe. And, notwithstanding Justice Scalia's "kiss of death" language in the dissent, seized upon by Doe, I conclude, and hope, Justice Scalia was more prophetic than sarcastic when he thereafter wrote: "Perhaps, then, not *all* the state statutes I have alluded to are invalid, but just *some* of them; or indeed maybe *all* of them remain valid in 'larger circumstances'!" *Id.* at 381, 115 S.Ct. 1511 (Scalia, J., dissenting). Because I disagree with the majority's holding that the Texas statute is facially unconstitutional, I respectfully dissent.